not required to provide notice to patent owners regarding maintenance fees.

We, however, find it unnecessary in this case to determine whether notice to a patentee that a maintenance fee is due is required. The PTO has adopted a policy of providing maintenance fee reminder letters to patentees or their representatives, 49 Fed.Reg. 34723 (1984), and provided notice in this case. In fact, the PTO provided two distinct notices that maintenance fees were due for Ray's patent. The first was on the inside cover of the patent document which Ray concedes he had in his possession. The second notice was the reminder letter mailed to Sherrard, Ray's legal representative. Therefore, whether the PTO had an obligation to provide notice is simply not an issue in this case.[2] Ray's contention that he did not have notice of the maintenance fee requirement is simply wrong. Ray clearly received the degree of notice mandated by due process.

■ Ray seeks to vitiate the notice in the patent itself with the explanation that he did not read the patent. Ray contends that the notice to Sherrard was insufficient because it was sent to an "obsolete" address, that of his designated representative, Sherrard. Rather than being an issue of whether notice was sufficient, we agree with the trial court and the PTO that Ray has simply not proved that his delay in paying the maintenance fee was unavoidable. This is especially true in this case because Ray did not provide a current address to either the PTO or Sherrard.

### C. Limited Responsibilities of Representative

■ Finally, Ray argues that Sherrard's responsibilities were limited and did not include payment of maintenance fees. This argument is completely inconsistent with Ray's contentions before the PTO where he asserted that "Mr. Sherrard did not fulfill his full obligations to Mr. Ray" with respect to payment of the maintenance fee. Whatever the responsibilities of Sherrard, we agree with the Commissioner that the PTO is not the proper forum for resolving disputes between patentees and their representatives.

### V. Conclusion

Ray has not shown that the trial court improperly granted summary judgment. Accordingly, the appealed judgment is affirmed.

*AFFIRMED.*

**In re James C. NAPIER.**

No. 93–1363.

United States Court of Appeals, Federal Circuit.

May 22, 1995.

---

Donald E. Stout, Antonelli, Terry, Stout & Kraus, Washington, DC, argued for appellant. With him on brief were William I. Solomon and Alan E. Schiavelli.

Fred E. McKelvey, Office of Sol., Arlington, VA, argued for appellee. With him on brief were Albin F. Drost, Deputy Sol., Richard E. Schafer, Associate Sol., Joseph G. Piccolo and Richard L. Torczon, Asst. Sol.

John T. Whelan, Fitzpatrick, Cella, Harper & Scinto, Chair, Bar Ass'n of District of Columbia, Patent, Trademark and Copyright Section, Washington, DC, was on brief for amicus curiae, Bar Ass'n of District of Columbia. Also on brief was Anthony W. Shaw, Burns, Doane, Swecker & Mathis, Alexandria, VA.

Before PLAGER, CLEVENGER, and SCHALL, Circuit Judges.

PLAGER, Circuit Judge.

James C. Napier (Napier) appeals from the March 16, 1994 decision of the United States Patent and Trademark Office Board of Patent Appeals and Interferences (Board), Appeal No. 93–0040. The Board affirmed the examiner's final rejection of claims 1–3, 5, 7, 8, and 10 of application Serial No. 07/467,-179 (the '179 application), entitled "Redirection of Turbine Exhaust Noise."[1] Claims 1–3 and 5 stand rejected under 35 U.S.C. §§ 102(b) and 103 (1988),[2] and claims 7, 8, and 10 stand rejected under 35 U.S.C. § 103. We agree that all the claims are unpatentable on the ground of obviousness under section 103, and therefore affirm.[3]

## BACKGROUND

Noise from both non-transportation and transportation-related sources, like aircraft, has long been recognized as a serious environmental problem, affecting human health and activity.[4] A major source of noise emitted by modern jet aircraft is the engines they employ, both for propulsion and for auxiliary power. Propulsion engines move the plane,

---

1. The Board also affirmed the examiner's rejection of claims 12–14, but appellant withdrew his appeal with respect to those claims.

2. Unless specified otherwise, all cites to the United States Code are for the year 1988.

3. Since we affirm under § 103 with respect to claims 1–3 and 5, we do not address the § 102 rejection of these claims.

4. *See* Roger W. Findley & S. Jay Plager, *State Regulation of Nontransportation Noise: Law and Technology,* 48 So.Cal.L.Rev. 209 (1974).

and provide power, mechanical, hydraulic, or electrical, for the operation of the aircraft while aloft. Auxiliary power units (APUs) are generally used to provide such operational power when the plane is on the ground.

Unlike the noise created by turbine propulsion engines, largely a function of fast moving exhaust air passing across relatively still air, the noise from an APU is produced by combustion within the engine. APUs, in operation when the plane is on the ground, are typically located in the rear section of the fuselage of an airframe behind the cargo doors. Their noise can be a problem for ground crew members working in or around the aircraft. Exhaust silencers have been used to reduce the amount of noise from APUs, but these have the disadvantage of being heavy and bulky, thereby reducing the operational efficiency of the aircraft.

The '179 application is directed to an aircraft APU that redirects noise, produced by combustion, away from specific locations on the aircraft. The device works by directing a stream of relatively cold air in a separate cold air pipe through the exhaust path of the engine to create essentially parallel flowing streams. Since sound travels faster through denser mediums, and cold air is denser than warm air, once the exhaust gases and separately contained cold air exit from the exhaust pipe, the sound from the APU refracts toward the path of cold air instead of the path it otherwise would take. Therefore, placing the cold stream in the center of the exhaust pipe of an APU permits redirecting of the noise away from locations on the aircraft (such as the cargo doors where ground crew are working) forward of the point at which the APU is mounted on the fuselage, thereby reducing the noise level at those locations.

The '179 application was filed on January 19, 1990, with Napier as the sole named inventor. The claims of that application that are at issue in this appeal are claims 1–3, 5, 7, 8 and 10.[5] On September 17, 1991, the examiner issued a final office action rejecting claims 1–3 and 5 as anticipated by U.S.Patent No. 4,567,960 (Johnson); claims 1–3 and 5 as obvious over Johnson; and claims 7, 8 and 10 as obvious over Johnson in view of U.S. Patent No. 3,599,749 (Millman).

Johnson is directed to a nozzle for reducing propulsion engine noise from aircraft during takeoff. The nozzle consists of air inlets that are connected to a central tube in the exhaust pipe such that during takeoff outside air is drawn into the central tube via the air inlets exiting at the downstream end of the central tube where it then mixes with the exhaust gases. According to Johnson,

5. The claims read:
   1. An auxiliary power unit in an airframe for producing only non-propulsion power which redirects noise produced by combustion comprising:
    a combustor for producing combustion gases which contain noise produced by combustion;
    a turbine rotor powered by the combustion gases form [sic, from] the combustor;
    at least one power producing device driven by rotation of the turbine rotor;
    an exhaust pipe having an inlet which receives combustion gases discharged from the turbine rotor and an outlet from which the combustion gases are discharged; and
    means, disposed within the exhaust pipe, for refracting noise in the combustion gases outside the exhaust pipe in a predetermined direction outside the exhaust pipe with respect to a centerline of the exhaust pipe to produce a net noise reduction at a selected part of the airframe.
   2. An auxiliary power unit in accordance with claim 1 wherein means for refracting comprises:
    a cold air supply coupled to the exhaust pipe for injecting cold air into the combustion gases which flow within the exhaust pipe and from the outlet substantially parallel to the combustion gases to cause noise present in the exhaust gases outside the outlet to be refracted in the predetermined direction outside the exhaust pipe from the combustion gases into cold air flow flowing from the outlet.
   3. An auxiliary power unit in accordance with claim 2 wherein the cold air supply injects air into a center portion of an interior cross-section of the exhaust pipe.
   5. An auxiliary power unit in accordance with claim 3 wherein:
    the auxiliary power unit is mounted in a rear portion of an airframe; and
    the noise is refracted in a direction toward a centerline extending from the exhaust pipe and toward a rear end of the airframe behind the auxiliary power unit to reduce the net noise at a cargo door of the airframe.
   7. An auxiliary power unit in accordance with claim 2 further comprising a compressor for supplying compressed air to the combustor and to the cold air supply.
   8. An auxiliary power unit in accordance with claim 3 further comprising a compressor for supplying compressed air to the combustor and to the cold air supply.
   10. An auxiliary power unit in accordance with claim 5 further comprising a compressor

the mixture of the outside air with the exhaust gases produces a significant noise reduction during takeoff. Millman is also directed to a nozzle for suppressing noise from a propulsion jet engine, but it additionally discloses the use of a compressor to supply the air that mixes with the exhaust gases.

The Board affirmed the examiner's final rejection in a decision dated March 16, 1993. Regarding claims 1–3 and 5, the Board determined, *inter alia,* that it would have been obvious to utilize the noise suppression teachings of Johnson on a non-propulsion power unit. As to claims 7, 8 and 10, the Board concluded that the combined teachings of Johnson and Millman would have rendered obvious the inventions defined in claims 7, 8 and 10. This appeal followed.

### DISCUSSION

■ It is well established that the ultimate determination of obviousness is a question of law, which we review without deference to the Board's judgment. *See In re Woodruff,* 919 F.2d 1575, 1577, 16 USPQ2d 1934, 1935 (Fed.Cir.1990). Therefore, it is our responsibility to make the final conclusion based on our reading of the record before us, giving appropriate deference to the Board's underlying factual determinations, such as what a reference teaches. *See In re Beattie,* 974 F.2d 1309, 1311, 24 USPQ2d 1040, 1041 (Fed. Cir.1992).

■ "Obviousness cannot be established by combining the teachings of the prior art to produce the claimed invention, absent some teaching, suggestion or incentive supporting the combination." *In re Bond,* 910 F.2d 831, 834, 15 USPQ2d 1566, 1568 (Fed. Cir.1990) (quoting *Carella v. Starlight Archery and Pro Line Co.,* 804 F.2d 135, 140, 231 USPQ 644, 647 (Fed.Cir.1986)). However, the "suggestion to modify the art to produce the claimed invention need not be expressly stated in one or all the references used to show obviousness." *Cable Elec. Prods., Inc. v. Genmark, Inc.,* 770 F.2d 1015, 1025, 226 USPQ 881, 886 (Fed.Cir.1985). Rather, the test is whether the combined teachings of the

prior art, taken as a whole, would have rendered the claimed invention obvious to one of ordinary skill in the art. *See In re Gorman,* 933 F.2d 982, 986, 18 USPQ2d 1885, 1888 (Fed.Cir.1991).

■ Napier's principal argument on appeal is that Johnson teaches the reduction of noise by mixing, whereas his claimed invention is directed to the redirection of noise by refraction. Therefore, according to Napier, one of ordinary skill in the art would not have been motivated to utilize the teaching of Johnson to produce the claimed invention. We disagree.

■ The inherent teaching of a prior art reference, a question of fact, arises both in the context of anticipation and obviousness. *See In re Grasselli,* 713 F.2d 731, 739, 218 USPQ 769, 775 (Fed.Cir.1983). The Board found that, although Johnson only discloses noise reduction resulting from the mixture of ambient air with the hot combustion gases, sound waves are inherently refracted in Johnson's system. In support, the Board relied on the teaching of the prior art British Patent No. 653,544 (British patent) which explicitly states that sound waves will be refracted from a hot gas to a cold gas due to the difference in densities.[6] In view of this evidence and the deference owed to Board fact findings, we conclude that the Board properly found that Johnson inherently discloses redirection of noise.

Regarding claim 1, the only other argued difference between the claimed invention and Johnson is that Johnson is directed to propulsion engines whereas Napier's claims are limited to non-propulsion APUs. Since noise from propulsion engines comes from shearing whereas noise from APUs is a result of combustion in the engine, it follows, Napier argues, these are directed to different specific problems, and therefore one of ordinary skill would not be motivated to utilize the teachings of Johnson regarding propulsion engines to solve the distinct problem regarding non-propulsion APUs. We again cannot agree.

for supplying compressed air to the combustor and to the cold air supply.

**6.** Col. 2, 11. 69–75. The British patent discloses a means and method for reducing aircraft

noise by positioning a baffle between the engine and fuselage such that relatively cold ambient air passes between the exhaust stream and the baffle, thereby redirecting noise from the exhaust stream into the baffle.

**614**

Even if we assume that Napier's claims are limited to only APUs,[7] propulsion engines and APUs combine to create the problem of noise generated from aircraft. It makes no difference that Johnson may have addressed a different mechanical source of the problem within the area of aircraft noise reduction, or a different noise-producing process. We agree with the Board that the goal of Johnson, to achieve "significant noise reduction" [8] from aircraft would have motivated one of skill in the art to apply teachings regarding noise reduction methods applicable to shear-generated noise from an aircraft's propulsion engine to the parallel problem of combustion noise from an aircraft's non-propulsion APU. *See In re Heck,* 699 F.2d 1331, 1332–33, 216 USPQ 1038, 1039–40 (Fed.Cir.1983). Thus we conclude that the Board did not err in rejecting claim 1 under section 103.

■ Napier has separately argued the merits of some of the other rejected claims, and therefore we must review the Board's decision with respect to each separately argued claim. As to claims 2 and 5,[9] Napier argues that it would not have been obvious to use a parallel flow of cold air and exhaust gases as recited in claim 2 or to redirect noise to produce a net reduction in noise at the cargo door as recited in claim 5. Although the Board did not separately address claim 2, even if this limitation—substantially parallel flow—was not found in Johnson, this would not be enough to avoid a rejection of the claim under section 103. Moreover, our review of the record shows that Figs. 3 and 4 of Johnson both show substantially parallel flow of the cold air and exhaust gases. As to claim 5, the Board concluded that since Johnson inherently reduces noise, the net noise at the cargo door would likewise be reduced. We find no reversible error in this finding, either. We therefore also affirm the Board's rejection of claims 2 and 5 as obvious over Johnson.

■ Finally, Napier argues that the Board erred in concluding that claims 7, 8 and 10 were obvious over the combination of Johnson and Millman. These claims, which de-

pend from claims 2, 3 and 5 respectively, all contain the further limitation that the compressor supply compressed air to the combustor and to the cold air supply. The Board found that Millman explicitly teaches that cold air from the compressor may be delivered via a conduit to the area of the exhaust pipe for the purpose of reducing noise, and therefore fairly suggested using this cold supply in Johnson's noise suppression system. We find no reversible error in that finding, and therefore, conclude, as did the Board, that Johnson in view of Millman renders claims 7, 8 and 10 obvious.

The Commissioner in his brief argues that in deciding this case, we should apply to the decision of the Board the standard of review applicable to administrative agency decisions set forth in the Administrative Procedure Act at 5 U.S.C. § 706, rather than the more stringent review standard our cases have articulated. *See, e.g., In re Baxter Travenol Labs,* 952 F.2d 388, 21 USPQ2d 1281 (Fed. Cir.1991); *In re Woodruff,* 919 F.2d 1575, 16 USPQ2d 1934 (Fed.Cir.1990); *In re De Blauwe,* 736 F.2d 699, 222 USPQ 191 (Fed.Cir. 1984). Whatever merit may lie in that position, the Commissioner will no doubt be gratified to know that we were able to affirm the Board in this instance under the more stringent standard. We thus find it unnecessary to address the question of whether the APA standard is, in an appropriate case, the applicable one. *See In re Brana,* 51 F.3d 1560, 34 USPQ2d 1436 (Fed.Cir.1995).

## CONCLUSION

The decision of the Board, sustaining the final rejection of claims 1–3, 5, 7, 8 and 10 as obvious, is affirmed.

*AFFIRMED.*

7. Napier argues that the reference to APUs in the preamble of claim 1, which is incorporated into the other claims through their dependency, is a limitation. We do not need to address this issue since we conclude that this difference does not save the claims from rejection under section 103.

8. Col. 6, 11. 56–57.

9. Napier has not separately argued the patentability of claim 3.