**TETON WEST CONSTRUCTION INC., Plaintiff,**

v.

**TWO RIVERS CONSTRUCTION INC., et al., Defendants.**

**CIV. No. 96–0030–E–BLW.**

United States District Court, D. Idaho.

March 10, 1997.

B. Newal Squyres, Holland & Hart, Boise, ID, H. Ross Workman, Workman Nydegger & Seeley, Salt Lake City, UT, Todd E. Zenger, Kirton & McConkie, Salt Lake City, UT, for Teton West Const., Inc.

Stephen J. Blaser, Blaser Sorenson & Hansen, Blackfoot, ID, James D. Berquist, Brian J. Beatus, Cushman Darby & Cushman, Washington, DC, for Two Rivers Const., Inc., Jerry Matson and Todd Lambert.

## MEMORANDUM DECISION AND ORDER

WINMILL, District Judge.

### INTRODUCTION

In this patent infringement action, Plaintiff Teton West Construction Inc. claims that Two Rivers Construction Inc. is constructing potato storage buildings using Teton West's patented air conditioning system. Two Rivers denies the infringement claim, and asserts that the patent is invalid. Two Rivers filed a motion for partial summary judgment on the validity issue. The Court heard oral argument, and the motion is now at issue. The Court concludes that the motion must be granted in part and denied in part. The motion is granted in part by the Court's interpretation of the patent, but is denied in all further respects because questions of fact exist as to whether the patent as interpreted falls within the statutory tests for invalidity. The Court will explain its reasoning after reviewing the factual background of this case and the legal standards governing this patent dispute.

### FACTUAL BACKGROUND

The patent at issue here—United States Patent 5,344,362 (" '362 patent")—describes a system for providing conditioned air to preserve stored potatoes. To understand the patent, some background is necessary. Potatoes are often stored in fabricated metal buildings with curved roofs known as Quonset or curvet buildings. It has long been known that proper air ventilation in the storage building will keep the potatoes from shrinking. For many years, the curvet storage buildings were built with an external shed—known as a "dog house"— containing air conditioning equipment that would supply temperature and humidity controlled air to the stored potatoes.

The conditioning equipment typically consisted of a fan blowing air through the constantly moist surface of a humidifying device. The fan-blown air picks up moisture and provides an evaporative cooling effect, lowering air temperatures 10 to 15 degrees Fahrenheit.

The conditioned air would be blown by the fan through an air plenum extending the length of the building. If the building was a double-wide structure—that is, if there were two curvet buildings side-by-side—the air plenum would extend down the middle of the two, buildings. With a single-wide building, the air plenum could be on the outside or the inside of the building. Vent pipes, with small holes extending the length of the pipes, are placed on the floor perpendicular to, and connecting with, the plenum. These vent

pipes extend to all corners of the building, and the potatoes are piled on top of the pipes. The conditioned air, flowing through the plenum, would be diverted into the vent pipes and thereby distributed to all the potatoes.

At some point in the early 1990s—although the date is not clear—Terrence F. Bagley, co-owner of Teton West, claims that he developed a process to move the conditioning equipment inside the curvet building. This concept, he asserts, makes the storage building easier and less expensive to build. Bagley applied for a patent on his idea on December 26, 1991. His patent application described a single-wide curvet building with an interior air plenum running down the side of the building, and a double-wide curvet building with an air plenum running down the middle of the two buildings. For both types of buildings, Bagley's patent application described an air conditioning system consisting of a fan and evaporative cell located within the curvet building. The conditioning system worked like the systems in use prior to his application, with the exception that the system was now housed within the building.

Bagley received the '362 patent on September 6, 1994, and immediately assigned it to Teton West. On January 19, 1996, Teton West filed this suit claiming that Two Rivers infringed the '362 patent by building three potato storage buildings with internal conditioning equipment as described in the patent.

Two Rivers has filed a motion for partial summary judgment, challenging the validity of the '362 patent. The Court will resolve the motion after reviewing the legal standards governing summary judgment motions, and the legal standards governing challenges to the validity of a patent.

## LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT

Summary judgment is as appropriate in a patent case as it is in any other case. *C.R. Bard Inc. v. Advanced Cardiovascular Systems*, 911 F.2d 670, 672 (Fed.Cir.1990).[1] The party moving for summary judgment has the burden of proving the absence of any genuine issue of material fact that would allow a judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility determinations. Id at 255, 106 S.Ct. at 2513–14. "When determining if a genuine factual issue ... exists, ... a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Id.* at 249–50, 106 S.Ct. at 2510–11.

Once the moving party demonstrates the absence of a genuine issue of material fact, the burden shifts to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256–57, 106 S.Ct. at 2514–15. In meeting this burden, the non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). This evidence must be admissible because "only admissible evidence may be considered in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Services, Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). The Ninth Circuit "has repeatedly held that,documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment." *Id.* The authentication requirement, embodied in Federal Rule of Evidence 901(a), is not satisfied simply by attaching a document to an affidavit. *Id.* The foundation must be laid by the testimony of a witness with personal knowledge of the facts who attests to the identity and due execution of the document. *Id.*

## LEGAL STANDARDS GOVERNING PATENT VALIDITY

██ A patent is presumed valid. 35 U.S.C. § 282. The burden is on the party

---

1. Decisions of the Federal Circuit, and its predecessor courts, the Court of Customs and Patent Appeals and the Court of Claims, control all questions of patent law before this Court. *South Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir.1982) (en banc).

challenging the patent to show, by clear and convincing evidence, that the patent is invalid. *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367 (Fed.Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). Because this standard must be employed at the summary judgment stage just as it would be used at trial, *Anderson v. Liberty Lobby, supra,* Two Rivers has the burden of showing that there is evidence in the record from which a finder of fact could find by clear and convincing evidence that the '362 patent is invalid. In an attempt to meet this burden, Two Rivers asserts that there is nothing new or novel about Teton West's ventilation process, and that the patent is hence invalid.

■ Patent validity is dependent on three explicit conditions—novelty, usefulness, and nonobviousness. 2 *Walker on Patents, supra,* § 6:1 at 5. Two Rivers challenges the novelty and nonobviousness of the '362 patent; the usefulness of the patent is not an issue in this motion.

Novelty and nonobviousness appear at first glance to be opposite terms describing the same idea—a novel device is not obvious, and an obvious device is not novel. But the law regards them as separate tests of patentability, and both must be satisfied in a valid patent. 2 *Walker on Patents, supra,* § 6:3 at 10. The concepts of novelty and nonobviousness are set forth in 35 U.S.C. § 102 and § 103, respectively. An examination of these statutory provisions highlights their differences.

■ Section 102 provides that a person is not entitled to a patent if the invention "was known or used by others ... before the invention thereof by the applicant for patent," *Id.* at § 102(a), or if "the invention was ... in public use or on sale ... more than one year prior to the date of the application for patent...." *Id.* at § 102(b). The case law refers to the prior use as "anticipation." That is, the patented claim is "anticipated" if there was prior use as defined in § 102. A patented claim is anticipated and therefore invalid under § 102 "only when a single prior art reference discloses each and every limitation of the claim." *Glaxo Inc. v. Novopharm Ltd.,* 52 F.3d 1043, 1047 (Fed.Cir.), *cert. de-*

nied, —— U.S. ——, 116 S.Ct. 516, 133 L.Ed.2d 424 (1995). Only one such prior use is necessary to invalidate the patent under § 102. 1 *Walker on Patents, supra,* § 4.18 at 325.

■ The test for nonobviousness under § 103 is not so strict: "In contrast to the novelty determination's strict identity requirement, that is, anticipatory prior art must disclose each element of the claim either expressly or inherently, the nonobvious determination [under § 103] does not require strict identity." H.F. Schwartz, *Patent Law and Practice* at 53 (Federal Judicial Center 1988). Section 103 provides, in pertinent part:

> A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The Supreme Court, in *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966), interpreted and applied § 103:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

■ In determining what would have been obvious to a person of ordinary skill in the art, the decision-maker may examine the following factors: (1) type of problems encountered in the art; (2) prior art solutions to those problems; (3) rapidity with which innovations are made; (4) sophistication of the technology; (5) educational level of the inventor; and (6) educational level of active workers in the field. *Environmental De-*

*signs v. Union Oil Co. of Cal.,* 713 F.2d 693 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). The decision-maker may also examine the "secondary considerations" mentioned by *Graham.* These secondary considerations include (1) commercial success; (2) a long-felt but unsolved need; (3) disbelief of experts; (4) unexpected results; and (5) failed efforts by others. H.F. Schwartz, *Patent Law and Practice, supra,* at 55. The decision-maker is required to consider any evidence on secondary considerations that is admitted. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530 (Fed.Cir.1983).

The determination of patent validity is a multi-step process. First, the Court must interpret the claims of the patent. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (en banc). This is a question of law. *Id.* To interpret the claims, the Court may consider three sources: The claims, the specification, and the prosecution history. *Id.*

Once the claims are interpreted, they must be examined under the novelty and nonobviousness tests of § 102 and § 103. In contrast to the interpretation issue, these issues raise questions of fact. *Glaxo,* 52 F.3d at 1047 (§ 102 test is question of fact); *In re Napier,* 55 F.3d 610, 613 (Fed.Cir.1995) ("The inherent teaching of a prior art reference, a question of fact, arises both in the context of anticipation [§ 102] and obviousness [§ 103].").

The Court will turn first to the legal task of interpreting the patent's claims. The Court will then examine whether it is appropriate in this summary judgment proceeding to apply the fact-specific novelty and nonobviousness tests to the claims as interpreted.

## INTERPRETATION OF PATENT CLAIMS

■ The scope of every patent is limited to the invention described in its claims. 6 *Walker on Patents, supra,* § 21:1 at 257. The '362 patent contains three claims. The first claim covers a curvet double-wide building with a fan and evaporative cell located within the building to provide conditioned air to stored potatoes. The second claim covers a curvet double-wide building with the fan and evaporative cell located within the building and a "partition forming panel ... to provide sequential air flow through the fan and evaporative cell." The third claim describes a curvet single-wide building with the fan and evaporative cell located within the building. Teton West has limited its infringement claim to the third claim of the '362 patent. *See, Brief of Teton West at 5 n. 1.* The Court will therefore restrict its examination to the third claim.

The full language of the third claim is set out below:

A curvet building for storage of potatoes comprising:

(1) [2] A floor,

(2) A peripheral wall, including a generally planar end wall, and a roof structure forming an enclosed space for potatoes arranged in a pile;

(3) Means in the peripheral wall in the building providing access to the enclosed space;

(4) An air plenum extending along a portion of the enclosed space;

(5) A plurality of vent pipes communicated with the air plenum and extending therefrom along the building floor and the bottom portion of the potato pile;

(6) Each vent pipe including a plurality of openings discharging air into the potatoes;

(7) A fan and evaporative cell communicated with the air plenum for supplying temperature and humidity controlled air to the air plenum for discharge into the potatoes;

(8) A fan house for the fan and evaporative cell forming an extension of the air plenum and receiving the fan and evaporative cell therein;

(9) Said fan house, fan, and evaporative cell being located within the interior of the end wall to substantially eliminate external projections thereon;

2. These paragraphs are not separately numbered in the patent claim itself. The Court has numbered the paragraphs so that they can be easily referred to later in this decision.

(10) Said floor and peripheral wall of the building defining rectangular space; and

(11) The roof structure being of arcuate transverse configuration to define a curvet building,

(12) Said air plenum extending along one sidewall of the curvet building;

(13) Said fan house being in communication with and forming an extension of one end of the air plenum;

(14) Said end wall of the building including an air inlet supplying fresh air to the fan house,

(15) Said fan and evaporative cell being spaced from each other to provide flow of conditioned air to the plenum and curvet building.

Many of the these paragraphs describe devices or systems that were in use long before Bagley's patent application. Bagley himself conceded this in his patent application as he reviewed the prior art, a review that became part of the patent:

> Commercial or seed potatoes are conventionally stored in buildings or cellars with the quantity of the stored potatoes typically ranging anywhere from 10,000 hundred weight to 500,000 hundred weight. When storing such potatoes, vent pipes of relatively large diameter having air discharge holes are placed along the floor of the storage building so that conditioned air having desired temperature and moisture characteristics passes through the vent pipes and is discharged through the holes into the stored potatoes. Various types of buildings are employed but usually, an air plenum extends throughout the length of the building and connects to the vent pipes. . . . . The air plenum can be typically located on the outside of the building or can be incorporated into the interior of the building. A fan and evaporative cell are located in a fan house which is the area designated to receive the fan and evaporative cell and one or more humidifiers and controls. The evaporative cells used are typically constructed of cellulose paper impregnated with insoluble anti-rot salts and rigidifying saturants and constructed for evaporative cooling with water dripping down through the cell and air being blown through the cell to pick up the moisture and to provide evaporative cooling. . . . The buildings may be of various constructions such as straight wall buildings, slope wall buildings, dirt/pole buildings and curvet style buildings. . . . U.S. Pat. No. 3,921,508 to Merson discloses potato storage buildings of arcuate or curvet style in which an air plenum extends longitudinally between two adjacent buildings with an external fan house being provided at one end of the buildings for circulating air through the plenum and potatoes.
>
> The prior art in this field of endeavor does not disclose an internal fan house constructed to accommodate an evaporative cell unit and a fan unit within the confines of a curvet style building or air plenum with it being noted that the Merson patent discloses a fan house projecting outwardly from the building.

■ This description of the prior art in the patent assists in interpreting the third claim: "The state of the prior art is important in construing the scope of a claim." 6 *Walker on Patents, supra,* § 21.20 at 331. The description of the prior art shows that there is nothing, novel about using fans and evaporative cells to provide conditioned air to stored potatoes through vent pipes placed along the floor of curvet style storage buildings. Thus, most of the paragraphs of the third claim, quoted above, describe features already in public use. The distinctive feature of the third claim is that the conditioning equipment is located inside the storage building. In other words, the heart of the '362 patent is described in paragraph 9 of the third claim: "[A] fan house, fan, and evaporative cell *being located within the interior of the end wall to substantially eliminate external projections thereon.* . . ." (emphasis added).

This conclusion is corroborated when the prosecution history of the '362 patent is reviewed. This prosecution history "is of primary significance in understanding the [patent's] claims." *Markman,* 52 F.3d at 980. "[W]hen a patent bears on its face a particular construction, inasmuch as the specification and claim are in the words of the patentee, . . . such a construction may

be confirmed by what the patentee said when he was making his application." *Id.* (quoting *Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 227, 26 L.Ed. 149 (1880)).

In this case, the Patent and Trademark Office (PrO) rejected Bagley's original patent application on the ground that the process was already described by three existing patents, and that under § 103, the process would have been obvious to someone skilled in the art. The three patents referred to by the PTO were known as the Merson, Coyle, and Johnson patents. None of these three patents identically matched the '362 patent, but the PTO felt that the three patents taken together covered everything in the '362 patent.

The Merson patent described a process for providing fresh air to stored potatoes, but described a fan housing that (1) was outside the storage building; (2) did not include an evaporative cell; and (3) did not provide conditioned air to the potatoes. The Coyle patent described the use of a fan and evaporator to provide conditioned air to fruit and vegetables in railway cars, but did not discuss the placement of such machinery inside a potato storage building. The Johnson patent described a process for drying hay that included a fan located within a barn. The PTO concluded that

> "[i]t would have been obvious to one having ordinary skill in the art at the time the invention was made to provide the storage building of Merson with the evaporator in Coyle in order to minimize any deterioration of the potatoes. Also, it would have been obvious to one having ordinary skill in the art at the time the invention was made to relocate the fan chamber of Merson to within the storage building as shown by Johnson in order to reduce the overall cost of the building."

Bagley filed a request for reconsideration, asserting that the Coyle patent described a refrigerant evaporator device that was quite different from the evaporator cell described in the '362 patent. Bagley also pointed out

that the Johnson patent described a simple fan for drying hay that was not at all similar to the fan and evaporative cell system that was described in the '362 patent.

The PTO again rejected the patent, but relied on somewhat different reasoning. This time, the PTO focused on Bagley's admissions about the state of the prior art, and relied less on the Coyle patent. The PTO pointed out that Bagley conceded that the prior art included fans and evaporative cells used to move conditioned air to the potatoes. Although this machinery was not located within the storage buildings in the prior art, the PTO found that "[i]t would have been obvious to one having ordinary skill in the art at the time the invention was made to position the fan chamber of Merson interiorly of the building, as taught by Johnson in order to reduce the overall cost of the building."

Bagley appealed once more, and stressed the elimination of external projections, and the placement of the fan and evaporative cell within the building:

> [T]here is no suggestion [in the prior patents] that an evaporative cell and fan together with a fan house for the fan and evaporative cell be located in relation to an end wall to eliminate external projections and to provide conditioned air to an air plenum for this type of building. While evaporative cells are known, there is no suggestion in the prior art that an evaporative cell should be positioned in a fan house within the interior of the building or inwardly of the end wall as specifically defined in [the '362 patent]. As discussed previously, the present invention eliminates the normally provided relatively large fan house or "dog house" projecting outwardly in front of a storage building. . . .

This time the PTO granted the patent.[3] When that patent is read together with the prosecution history set out above, the distinctive feature of the third claim of the '362 patent is contained in that part of paragraph 9 describing the "fan house, fan, and evapo-

---

**3.** The PTO has no discretion to deny a patent if all the statutory requirements are met. 35 U.S.C. § 151; *Markman,* 52 F.3d at 985 n. 14.

rative cell *being located within the interior of the end wall to substantially eliminate external projections thereon....* " (emphasis added).

## TEST FOR PATENT INVALIDITY UNDER § 102 AND § 103

So interpreted, is the '362 patent novel under § 102 and nonobvious under § 103? Both tests require close examination of the prior art which often raises factual questions, as previously discussed. Two Rivers has submitted what it describes as proof of eight instances where ventilation systems identical to those described in the '362 patent were located within potato storage buildings. The Court will examine all eight instances.

### 1. Critchfield Farms Building

■ Two Rivers submits a blueprint and contract for the construction of a potato storage building for Critchfield Farms. The blueprint is signed by an M.L. Plant who is listed as the preparer. It appears from the blueprint that Plant worked for Industrial Ventilation, Inc. (IVI) at the time he prepared the drawing. There is nothing in the record from Plant or anyone at IVI authenticating this blueprint. The Court discussed previously the long-standing Ninth Circuit requirement that evidence must be properly authenticated under Rule of Evidence 901(a) before it may be considered in a summary judgment proceeding. *Beyene*, 854 F.2d at 1182. This evidence has not been properly authenticated and thus the Court must disregard it in this summary judgment proceeding.

### 2. Walter's Produce Building

■ Two Rivers submits a copy of a Teton West advertisement containing a photograph of a curvet potato storage building with a caption underneath that reads, "31 years of continuous use (Behlen Curvet built in 1962 for Walter's Produce, Newdale, *Id.*)." Two Rivers brief states that the photo shows "no external projections ... because the fan and fan house are positioned within the interior of the curvet building's end wall." *See, Brief of Two Rivers at 12.* But statements in a brief are not part of the record on sum-

mary judgment. Although the photo shows no external projections, only the front of the building is depicted. Without being able to view the building from all angles, the Court is left to speculate. The building may well have an internal ventilation system, but Two Rivers has not produced the evidence to establish that fact. The Court must therefore disregard the evidence concerning the Walter's Produce building in this summary judgment proceeding.

### 3. O.E. Feld Building

Two Rivers submitted a blueprint of a curvet storage building prepared by a S.L. Warner. There is nothing in the record from Warner or anyone else authenticating the blueprint. It therefore must be disregarded.

### 4. Industrial Ventilation Blueprint

Two Rivers submitted a blueprint from IVI dated January 16, 1989 depicting a curvet storage building that appears to have an interior fan and "Humidicell" system. "Humidicell" is IVI's trademarked name for an evaporative cooler. The blueprint also contains the heading "Teton West Steel." Although the Plaintiff in this case is Teton West Construction Inc., Teton West does not deny being the client for whom this drawing was prepared.

The blueprint appears to have been modified. Two Rivers submitted the Declaration of Charlie E. Morgan who worked for IVI and approved the blueprint. Morgan states that the modifications must have been made after he approved the drawing although he did not know anything about the modifications. Two Rivers states in its briefing that "the ideas contained [in the blueprint] were offered for sale and disclosed to others, including Teton West...." *See, Brief of Two Rivers at 15.* But this statement is not supported by any evidence in the record. Once again, statements in a brief do not constitute admissible evidence is a summary judgment proceeding. The Court has not been provided with an affidavit or declaration from anyone at IVI, including Charlie Morgan, establishing that the blueprint was actually shown to Teton West or to anyone else.

In addition, the Court has not been provided with any evidence that a building was actually built from the blueprint. Under these circumstances, the Court finds that Two Rivers has not provided sufficient proof to make relevant in this summary judgment proceeding the IVI blueprint dated January 16, 1989.

### 5. Declarations of Rich, Mickelson, and Funk

Two Rivers submits declarations of Clayton Rich, Dale Mickelson, and Darrell Funk. Funk owns two potato storage buildings, Mickelson owns one, and Rich builds them. Funk's buildings were built in 1987, and are curvet buildings containing a fan and "humidification system" located within each building to provide conditioned air through an air plenum to ventilation pipes that discharge the air under the potato piles. *See, Declaration of Funk at ¶¶ 1–6.* Mickelson's building was built in 1985, and is also a curvet building containing a fan and "humidification system" located within the building to provide conditioned air through an air plenum to ventilation pipes that discharge the air under the potato piles. *See, Declaration of Mickelson at ¶¶ 1–6.* Rich built a curvet building for Allen Murdock in 1973 that contained a fan and "humidification system" located within the building to provide conditioned air through an air plenum to ventilation pipes that discharge the air under the potato piles. *See, Declaration of Rich at ¶¶ 1–6.*

These declarations meet the qualifications for admissible evidence in a summary judgment proceeding, and will be considered by the Court. The Court shall examine the declarations under the § 102 and § 103 tests.

 Under the § 102 test, none of the prior uses described in the declarations "disclose each and every limitation of the claim." In all three examples, a "humidification system" is described without mention of an evaporative cell. It may be that an evaporative cell is a type of humidification system,

but nowhere in the record is the difference between these terms explained.[4] An unexplained difference certainly creates an issue of fact. The Court declines to rule as a matter of law that the Rich, Mickelson, and Funlk Declarations establish that the '362 patent is not novel under § 102.

 The § 103 test is not so strict. The prior use does not need to be completely identical to the '362 patent for § 103 purposes. The question now is whether the "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103.

Teton West has not filed anything to rebut the factual claims contained in the Rich, Mickelson, and Funk Declarations. Therefore, the Court will accept as true the statements in the declarations that fans and "humidification systems" were located within single-wide curvet potato storage buildings to provide conditioned air to stored potatoes, and that these systems were used well before Bagley's patent application and invention.

It is also undisputed that fans and evaporative cells were used prior to Bagley's invention to provide conditioned air to stored potatoes, although this ventilation equipment was housed in an external building.

This record therefore shows that the prior art included the use of evaporative cells *outside* the storage building and humidification systems *within* the building. The narrow issue under § 103 can now be stated as follows: Did the prior use of evaporative cells outside the building and humidification systems within the building make it obvious to a person having ordinary skill in ventilation design for potato storage buildings to replace the humidifying systems with evaporative cells?

---

4. Two River's patent law expert, John M. Howell, concludes that there is not much difference between the humidifiers described in the three declarations and the evaporative cell described in the '362 patent. But Howell does not claim to be an expert in humidifiers or evaporative cells, and makes no effort to explain his conclusion. Most importantly, Howell makes this conclusion while discussing the § 103 test, not the § 102 test. The Court will address Howell's conclusion in its discussion of the § 103 test, but finds his conclusions inapplicable to the § 102 test.

Such a replacement would have been obvious according to Two River's patent law expert, John Howell. He states in his declaration that the difference between the humidification system and the evaporative cell is "not a patentable difference considering that both types of humidifying elements were well known in the art and there is nothing in either the '362 patent or its prosecution history to indicate why using one as opposed to the other is unobvious and patentable." *See, Declaration of Howell at 18, ¶ 32.*

Howell is a patent attorney who concedes that he has no experience designing ventilation systems for stored potatoes. This is probably why he fails to explain in any detail his conclusion that the two systems are similar. In fact, there is no evidence in the record describing the two systems to allow a comparison to be made. And there is no testimony from any person qualified as having "ordinary skill" in ventilation systems to establish what was known by ordinarily skilled designers. The Supreme Court in *Graham* requires under § 103 that this Court determine "the differences between the prior art and the claims at issue," and resolve "the level of ordinary skill in the pertinent art." *Graham,* 383 U.S. at 17–18, 86 S.Ct. at 693–94. The Court cannot fulfill its obligations under *Graham* on the basis of the present record.

This failure of proof cuts against Two Rivers, because the patent is presumed valid, and the burden is on Two Rivers to show invalidity. As discussed previously, the § 103 test is largely a factual question. Thus, a failure of proof that raises factual questions precludes summary judgment. Under these circumstances, the Court cannot find the '362 patent invalid as a matter of law under § 103.

## INEQUITABLE CONDUCT

Two Rivers also claims that the patent is invalid because Teton West failed to advise the PTO about the January 16, 1989 IVI blueprint discussed earlier and the contributions of an individual named Don Murray to the invention. Two Rivers asserts that the IVI blueprint together with deposition testimony from Murray show that Murray and other IVI employees were at least co-inventors. The failure of Bagley to notify the PTO of these co-inventors constitutes inequitable conduct invalidating the '362 patent, according to Two Rivers.

To prevail on this claim, Two Rivers must show by clear and convincing evidence that Teton West misrepresented facts to the PTO during prosecution of the patent, that the misrepresentations were material, and that Teton West acted with the intent to deceive the PTO. *Glaxo,* 52 F.3d at 1048. Bagley has filed his declaration stating that he never saw the IVI blueprint before this litigation. Furthermore, the Court has already ruled that the IVI blueprint is not properly authenticated and thus cannot be considered in this summary judgment proceeding. The IVI blueprint thus does not support Two Rivers' claim of inequitable conduct.

Teton West's counsel claims that he was not notified of the Murray deposition until the very day that the deposition was taken. Until this dispute is resolved, the Court refuses to rely on the Murray deposition.

Two Rivers has not shown inequitable conduct by clear and convincing evidence. The Court will therefore deny Two River's motion for partial summary judgment on the ground of inequitable conduct.

## CONCLUSION

The Court has interpreted the third claim of the '362 patent and narrowed the invalidity issues. The distinctive feature of the third claim of the '362 patent is contained in the language in paragraph 9 as quoted earlier in this opinion. The remaining issues on patent validity under both § 102 and § 103 require testimony largely limited to a comparison of the humidification systems discussed in the declarations and the evaporative cell described in the '362 patent. The specific issue under § 102 is whether these humidification systems are identical to the evaporative cell, thereby satisfying § 102's strict test. However, there may be other differences between the systems in prior use and the system described in the third claim of the '362 patent that must also be explored under § 102, to

determine whether a "single prior art reference discloses each and every limitation of the claim." *Glaxo,* 52 F.3d at 1047.

With regard to § 103, the issue is this: Did the prior use of evaporative cells outside curvet potato storage buildings and the prior use of humidification systems within such buildings make it obvious to a person having ordinary skill in ventilation design for such buildings to replace the humidifying systems with evaporative cells? In addition, there may be issues concerning the "secondary considerations" listed in *Graham* and discussed earlier in this Memorandum Decision. Finally, there may be issues of inequitable conduct.

It would appear to the Court that a short and focused trial could resolve the remaining factual questions on the validity issue. Thus, one option for this litigation is to have a "mini-trial" limited to the validity issues. If the patent is declared valid at the conclusion of that mini-trial, then this action would proceed on the remaining issues. If the patent is declared invalid, the litigation is over. To start a discussion on this issue, the Court will direct counsel to contact the Court's calendar clerk, LaDonna Garcia (208) 334–9021, to set up a status conference to discuss whether such a mini-trial is feasible.

### ORDER

In accordance with the views expressed in the Memorandum Decision above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for partial summary judgment filed by Defendant Two Rivers (Docket No.36) shall be, and the same is hereby, GRANTED IN PART AND DENIED IN PART in accordance with the terms of the Memorandum Decision set out above.

IT IS FURTHER ORDERED, that counsel shall contact the Court's calendar clerk LaDonna Garcia for the purpose of setting up a status conference to discuss the setting of a trial date to resolve the patent validity issues and the procedures for that trial as discussed in more detail in the Memorandum Decision set out above.