**ELECTRONIC PLANROOM, INC., and Essential Research, Inc., Plaintiffs/Counter–Defendants,**

v.

**The MCGRAW–HILL COMPANIES, INC., and Estate of Devon Shire, Defendants/Counter–Plaintiffs.**

**and**

**The McGraw–Hill Companies, Inc., Third–Party Plaintiff,**

v.

**G. Matthew Krause, Third–Party Defendant.**

**No. 99–71985.**

United States District Court, E.D. Michigan, Southern Division.

March 30, 2001.

Jon R. Steiger, Kirkland W. Garey, Thomas H. Walters, Howard & Howard, Attorneys, P.C., Bloomfield Hills, MI, David J. Gaskey, Carlson, Caskey & Olds, P.C., Birmingham, MI, for plaintiffs.

Jeffrey G. Heuer, Patrice S. Arend, Jaffe, Raitt, Heuer & Weiss, P.C., Detroit, MI, Robert G. Krupka, Linda S. Resh, Alexandra N. DeNeve, G. Courtney Holohan, Kirkland & Ellis, Chicago, Illinois, for The McGraw-Hill Companies, Inc., and Devon Shire.

## OPINION AND ORDER REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiffs Electronic Planroom, Inc. and Essential Research, Inc. (collectively "Es-

sential"), two Michigan corporations, commenced this action on April 21, 1999 against Defendants The McGraw–Hill Companies, Inc. ("McGraw–Hill"), a New York corporation, and Devon Shire, a Michigan resident and former employee of Essential. In an amended complaint filed on January 24, 2000, Essential asserts state-law claims of misappropriation of trade secrets, tortious interference, and civil conspiracy against both Defendants, as well as a state-law breach of fiduciary duty claim against Defendant Shire. Essential further asserts a claim against McGraw–Hill under the federal patent laws, 35 U.S.C. § 1 *et seq.*, alleging that McGraw–Hill's "Dodge View" software infringes Essential's rights under U.S.Patent No. 5,625,827 (the " '827 Patent"). This Court has subject matter jurisdiction over these state and federal claims under 28 U.S.C. § 1338(a) and 28 U.S.C. § 1367(a).

Defendants have asserted three counterclaims against Essential, seeking declarations of the non-infringement, invalidity, and unenforceability of the '827 Patent. McGraw–Hill also is pursuing a claim against Third–Party Defendant G. Matthew Krause, a named inventor and former owner of the '827 Patent, alleging that Krause failed to disclose material prior art during the prosecution of the '827 Patent, and seeking a declaration that the patent is unenforceable as a result of this alleged inequitable conduct.

By motion filed on March 1, 2000, Essential now seeks summary judgment in its favor on the issue of McGraw–Hill's alleged infringement of claim 5 of the '827 Patent. For their part, Defendants filed a motion on April 5, 2000, requesting an award of summary judgment in their favor on Essential's state-law claims and on Defendants' counterclaim asserting the invalidity of the '827 Patent. These motions have been fully briefed by the parties, and

the Court held a hearing on these motions on August 31, 2000. Having reviewed the briefs and voluminous supporting materials submitted by the parties, and having considered the arguments of counsel at the August 31 hearing, the Court is now prepared to rule on the parties' motions. This Opinion and Order sets forth the Court's rulings.

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

### A. The Parties to This Action

Plaintiff Essential is a small company located in Rochester, Michigan, with approximately a dozen employees at the time of the events giving rise to this litigation. Essential develops and sells "electronic planroom" technology to the construction industry, consisting of computer software and services that assist building contractors in obtaining information about available construction jobs and preparing competitive bids for these projects. At all relevant times, Third–Party Defendant G. Matthew ("Matt") Krause has served as president of Essential.

Defendant McGraw–Hill, through its F.W. Dodge subsidiary, has provided construction news services to subscribing contractors for over a century. Since 1998, McGraw–Hill has marketed and sold its "Dodge Plans" service, which permits subscribers to obtain computer-based plans and specifications for available construction jobs via CD–ROM or the Internet. The "Dodge Plans" package includes "Dodge View" software that allows subscribers to view the electronic plan and specification data made available through the "Dodge Plans" service.

Defendant Devon Shire was employed as Essential's Vice President of Sales and Marketing from October 10, 1994 through July 3, 1998. During most of this time,

Shire was Essential's entire sales force. Shire did not sign, nor was he asked to sign, a confidentiality or non-compete agreement with Essential. In July of 1998, Shire resigned his position at Essential and began working for McGraw–Hill as a Sales Specialist for the "Dodge Plans" product line.[1]

## B. Essential's '827 Patent

In connection with Essential's development of its "electronic planroom" technology, Third–Party Defendant Matt Krause and a programmer at Essential, Brent Morrow, applied for a patent on December 23, 1994. This patent was issued on April 29, 1997 as U.S.Patent No. 5,625,827 with nine claims, and is entitled "Method and System of Blueprint Document Manipulation." All rights to this patent subsequently were assigned to Essential.

The computer-based system described in the '827 Patent permits the viewing and manipulation of building plans, blueprints, and construction drawings. The patent sets forth a method for displaying construction drawings on a computer monitor, storing these drawings in electronic form in computer memory, and compiling scaling data that is stored along with each drawing in a single computer file. This scaling information permits a user of the system to measure distances between selected points on a drawing as it is displayed on the computer monitor, and to obtain these distances in "real world" rather than computer-based dimensions. According to Essential, this measurement capability assists in the process of preparing bids for construction projects by allowing the user to more quickly and accurately determine the time and materials needed to complete a job.

Specifically, claim 1 of the '827 Patent states as follows:

1. A method for manipulating a construction drawing comprising the steps of:

a. storing in electronic form in a memory means an image of a construction drawing in a file, the construction drawing having a full scale dimension associated therewith;

b. displaying the image of the construction drawing in the file on a video display means;

c. storing in the file a scale quantity representing the full scale dimension between two selected scale points on the image of the construction drawing;

d. storing in the file a scale line extending between the two scale points on the image of the construction drawing, the scale line representing a distance expressed as a predetermined number of image units;

e. selecting any two measuring points on the image of the construction drawing; and

f. automatically determining a full scale dimension between the selected two measuring points from the scale quantity, the scale line and a number of the image units between the two measuring points.

(Defendants' Motion, Ex. 41, at col. 18.)

Claims 2, 3, and 4 depend on claim 1, and include such added steps as displaying on the computer monitor the "full scale dimension" calculated in step "f" of claim 1, and computing conversion factors between on-screen pixel coordinates, computer-based image units, and real-world or

---

1. Mr. Shire died on March 15, 2000, apparently from a self-inflicted shotgun wound. By Opinion and Order dated August 7, 2000, the Court substituted Mr. Shire's estate as a party in place of Mr. Shire himself.

"full scale" dimensions. Claim 5 likewise depends on claim 1, but adds the step of computing the "full scale area dimension" of an enclosed area within a drawing as selected by the user. Finally, the remaining two claims at issue in this case, claims 7 and 9, are similar to claim 1, except that they describe methods of working with collections of construction drawings as opposed to individual drawings.

## C. McGraw–Hill's "Dodge Plans" Product

As noted earlier, McGraw–Hill's subsidiary, F.W. Dodge, has for many years offered various products and services to the construction industry that enable contractors to learn the details of construction projects available for bid. For example, Dodge offers a service called "Dodge SCAN," which provides blueprints on microfilm to subscribers. Dodge also has established "planrooms" around the country where blueprints and specifications may be reviewed and copied. However, as of the mid–1990s, Dodge did not yet offer a computer-based product that would permit contractors to rapidly obtain and conveniently view digital images of plans and blueprints on their own office and portable laptop computers.

Accordingly, McGraw–Hill hired Jerry Murtaugh, a former IBM employee with a background in computer graphics, to develop a method for digital delivery of construction plans and blueprints to the contractor's desktop. In 1995, Murtaugh identified two companies, Essential and Sierra Networks, as engaged in this digital plans business. McGraw–Hill subsequently entered into discussions with both of these companies to explore possible partnerships in developing and marketing digital plans products. During an initial September 1995 meeting between Murtaugh and Matt Krause and Devon Shire of Es-

sential to discuss a possible partnership, Murtaugh learned that Essential was in the process of obtaining patents on its software. In addition, on June 30, 1997, Krause wrote to Larry Wares of F.W. Dodge, enclosing copies of two patents held by Essential, including the '827 Patent. (See Plaintiff's Response, Ex. G.)

Ultimately, in June of 1997, McGraw–Hill and Essential abandoned their joint venture discussions, when the parties were unable to agree on the terms of a licensing arrangement for McGraw–Hill to market Essential's products and services. (See Defendants' Motion, Exs. 10, 11.) Instead, in July of 1997, McGraw–Hill paid a flat fee of $25,000 to an Oregon software developer, John Ritzenthaler, to secure a license to his "Bidview" software package. (See Plaintiffs' Response, Ex. F.) McGraw–Hill then incorporated this software into its "Dodge Plans" product as "Dodge View," and introduced this product line into the market in early 1998. According to Essential, the "Dodge View" software unlawfully infringes its rights under the '827 Patent by allowing users to view construction drawings on a computer monitor and associating real-world scaling data with each computer-based drawing, albeit in a separate computer file.

## D. Devon Shire's Resignation from Essential and Employment with McGraw–Hill

Certain of Essential's claims in this case stem from Defendant Shire's actions as he resigned from his sales position at Essential and assumed a similar position at McGraw–Hill. In particular, Essential alleges that Shire unlawfully took proprietary, trade secret information from Essential's computer systems as he left, and that, in the process, he deleted certain of this data from Essential's computers so that his former employer could no longer

gain access to it. Essential further alleges that Shire and his new employer, McGraw–Hill, exploited this trade secret information to McGraw–Hill's advantage, causing customers to cancel their contracts with Essential and switch to McGraw–Hill's competing "Dodge Plans" product.

As noted earlier, Devon Shire was hired by Essential in October of 1994 as Vice President of Sales and Marketing, and remained in this job until July 3, 1998. During this time, Shire was the principal— and, indeed, often sole—member of Essential's sales force. In this role, he had regular contact with Essential's current and prospective customers, as he sought to sell subscriptions to the company's electronic blueprint and specification delivery service, the "Electronic Planroom." At no time, however, was Shire asked to sign a confidentiality or non-compete agreement.

To assist in his sales efforts, Shire used "Alpha IV" database software he had purchased in 1992, prior to his employment with Essential, to track his daily sales activities, record business expenses, and maintain a personal daily journal. Shire maintained this database on his desktop computer at work, and occasionally used "Laplink" software to transfer this sales information to his personal laptop computer.

Shire also kept a database of "leads" (*i.e.*, prospective customers) using the Alpha IV software. Certain of these leads came from Essential's advertising efforts, and from business cards obtained by Shire or other Essential employees at trade shows or seminars. Shire obtained other sales leads through Essential's affiliation with two Michigan trade groups, the Construction Association of Michigan ("CAM") and the Grand Rapids Builders Exchange ("BEX").[2] Shire also used the commercially available "Pagemaker" software program to develop sales materials such as marketing flyers and customer subscription forms. As with the Alpha IV software, Shire apparently used a version of Pagemaker that he had obtained on his own, and not through his employer.

In early 1998, Shire began seeking new employment opportunities. As part of this effort, he spoke to an F.W. Dodge employee, Robert Singerline, about opportunities with Dodge. This initial contact led to several meetings with various Dodge employees over the next few months, during which Dodge demonstrated its "Dodge Plans" product to Shire, and Shire in turn volunteered that he maintained a database of customer leads.[3] These discussions culminated in a June 29, 1998 offer for Shire to work as a "Sales Specialist" for the "Dodge Plans" product line. Shire accepted this offer the next day, and began working for McGraw–Hill on July 7, 1998.[4]

As his employment with Essential wound down, Shire took a number of unusual steps to either delete or secure personal copies of data he had accumulated on his desktop computer during the course of

2. In fact, during the period of Shire's employment with Essential, all of Essential's customers were members of either CAM or BEX. (*See* Defendants' Motion, Ex. 5, Krause Dep. at 50.)

3. McGraw–Hill's national sales manager for the "Dodge Plans" product, Michael Reeves, acknowledged at his deposition that Shire had mentioned his database of leads during an initial interview. (Defendants' Motion, Ex.

12, Reeves Dep. at 67–68.) Reeves further testified, however, that he was "not interested in databases," and "didn't care who [Shire] knew about or didn't," because McGraw–Hill had "been around for 108 years" and knew "who the real players are." (*Id.* at 68.)

4. That same week, McGraw–Hill released "Dodge Plans" for sale in its Cleveland sales region, which includes Michigan.

his employment. Specifically, upon investigating Shire's computer after his departure,[5] Essential learned that the customer lead database previously maintained by Shire on that computer had been deleted, along with many other files. Essential also discovered that Shire had created two "zipped" (*i.e.*, compressed) files on his computer's hard drive: (1) PAGE-MAKE.ZIP, a compilation of Shire's various files created using the Pagemaker software; and (2) BBSUSER.ZIP, a compressed copy of the "BBSUSER" database used by Essential in connection with an on-line "bulletin board" system offered to Essential's customers.[6] Shire apparently sent these compressed files to himself as attachments to electronic mail messages, and then accessed his electronic mailbox remotely from his home a short time later. Upon securing copies of these "zipped" files on his home computer, Shire deleted these files from his office computer, and defragmented the computer's hard drive.[7] Finally, Matt Krause of Essential testified that Shire was given a prototype version of the company's "Takeoff" software in June of 1998, and that Shire failed to return this software upon resigning from Essential. (Defendants' Motion, Ex. 5, Krause Dep. at 87–92.)

Shire also was less than forthcoming in divulging his plan to resign his position at Essential and begin working at McGraw-Hill. According to Essential's president, Matt Krause, Shire met with him on a few occasions in June and early July of 1998 to discuss Essential's plans and strategies regarding McGraw–Hill and the "Dodge Plans" product, (Plaintiffs' Response, Ex. 1, Krause Aff. at ¶¶ 21–22), without disclosing that he had accepted a position with McGraw–Hill. Similarly, Brent Morrow, an Essential programmer, testified at his deposition that Shire contacted him shortly before he resigned to inquire about Essential's patents, and to ask how far Essential might go to defend those patents. (Defendants' Motion, Ex. 46, Morrow Dep. at 162–65.) On Monday, July 6, 1998, Shire gave Essential its first notice that he was resigning, effective July 3, 1998, and stated that he was going to work for a credit bureau. At his deposition, Shire testified that "[i]t just was quite frankly none of their business, so I made up a story." (Defendants' Motion, Ex. 1, Shire Dep. at 409.)

Immediately upon commencing his employment with McGraw–Hill, Shire began accompanying salespeople on their customer calls to assist in presenting the "Dodge Plans" product. Indeed, on July 8, 1998, just two days after he resigned from Essential, Shire accompanied a Dodge salesperson, Tom Burnosky, as he visited Stafford Insulation in Wyoming, Michigan, an existing customer of both Essential and McGraw–Hill.[8] Shire testified that he did

---

5. This investigation was performed in two phases. First, Essential's computer network administrator, William Baxter, was asked to examine Shire's computer shortly after his departure to McGraw–Hill. Next, in connection with this litigation, Essential retained John H. Sayler, Ph.D., a professor of computer science at the University of Michigan, to analyze the hard disk drive on the computer used by Shire during his employment at Essential.

6. This BBSUSER database contains various customer-related information, and is used to validate users as they sign on to the bulletin board system, as well as for billing and customer support purposes.

7. This process of defragmentation makes it more difficult, if not impossible, to recover deleted data from the hard drive.

8. Coincidentally, Chris Welch of Stafford Insulation had been in frequent contact with Shire in late June of 1998 regarding a new printer he had purchased that would not work with Essential's service and software. (Defendants' Motion, Ex. 15, Welch Aff. at

not arrange these sales calls or attend them at his own initiative, but instead was "at the[ ] disposal" of Dodge's sales representatives, provided support for them, and accompanied them on sales calls at their request. (Defendants' Motion, Ex. 1, Shire Dep. at 105–06, 112–13.)

McGraw–Hill's sales of its "Dodge Plans" product improved immediately after Shire joined the company. (Defendants' Motion, Ex. 12, Reeves Dep. at 148–49.) McGraw–Hill's national sales manager for "Dodge Plans," Michael Reeves, testified that "sales improved immediately," and that Shire's "ability to teach the sales rep how to sell the product had an immediate impact." (*Id.* at 149.) In contrast, Essential's sales performance "decreased substantially" following Shire's departure in July of 1998, and 19 customers canceled their subscriptions to Essential's services during the first three months after Shire's resignation. (Plaintiffs' Response, Ex. 1, Krause Aff. at ¶ 26.) Stafford Insulation, for one, terminated its subscription to Essential's "Electronic Planroom" service within a few weeks after Shire joined McGraw–Hill, and elected to use the new "Dodge Plans" service. (Defendants' Motion, Ex. 15, Welch Aff. at ¶¶ 14–15.) [9]

## E. Procedural Background

Essential brought the present suit in this Court on April 21, 1999. The initial complaint alleged that Defendants infringed Essential's patent and trademark rights, misappropriated trade secrets, tortiously interfered with contracts and business relationships, and civilly conspired against Essential. On May 28, 1999, Defendants filed their answer and asserted several counterclaims against Essential, primarily seeking declarations of the non-infringement, invalidity, and unenforceability of the '827 Patent.

By stipulated order entered on September 2, 1999, the Court dismissed certain portions of the complaint and counter-claims relating to trademark infringement. On January 24, 2000, Essential filed an amended complaint implementing the parties' agreement as embodied in the September 2 stipulated order, and Defendants filed an amended answer and counter-claims on January 31, 2000. Finally, on January 21, 2000, Defendants filed a third-party complaint against Matt Krause, joining him as a party to their claim of patent unenforceability.

Essential brought its present motion for summary judgment on March 1, 2000, asserting that, as a matter of law, McGraw–Hill's "Dodge View" software infringes claim 5 of the '827 Patent. Defendants filed their cross-motion on April 5, 2000, seeking summary judgment in their favor on Essential's state-law claims and on their counterclaim of patent invalidity. The Court heard argument on these motions on August 31, 2000.

¶ 7.) According to Welch, when Shire arrived at Stafford's facility on July 8, 1998, Welch asked if he could assist in fixing the printer problem, but Shire stated that he could not because he now worked for Dodge, and he suggested that Welch contact Essential for assistance. (*Id.* at ¶ 13.) Welch further states that Shire and Burnosky dropped in unannounced on July 8, and that he did not have an appointment with Shire on that or any other day. (*Id.* at ¶ 10.) According to Brent Morrow of Essential, however, Welch told him, during conversations about the printer

problem, that he had contacted Shire, and that Shire had promised to visit Welch the following day. (Defendants' Motion, Ex. 46, Morrow Dep. at 12–14.)

9. In all, Essential's damages expert, Robert J. Rock, C.P.A., estimates that Essential sustained damages of at least $447,308 in customers lost to McGraw–Hill between July 1, 1998 and December 31, 1999. (*See* Plaintiffs' Response, Ex. O, Rebuttal Expert Report of Robert J. Rock, Schedule II–R.)

## III. *ANALYSIS*

### A. The Standards Governing the Parties' Motions

Through their present motions, both Essential and Defendants seeks summary judgment in their favor pursuant to Fed. R.Civ.P. 56. Under this Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment. As stated in *Celotex:*

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy of cases, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989); *see also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in resolving the parties' motions for summary judgment.

### B. The Admissibility of Various Affidavits

Before turning to the merits of the parties' motions, the Court first must address the evidentiary challenges mounted by the parties against certain affidavits submitted in support of or opposition to these motions. These evidentiary disputes arise principally from the recent death of Defendant Devon Shire, whose affidavit is submitted in support of Defendants' motion, and whose alleged statements are referred

to in other affidavits. For instance, in its response to Defendants' motion, Essential argues that Shire's affidavit is not admissible, and tersely cites Federal Rules of Evidence 803 and 804 in support of this position.[10] For their part, Defendants argue that Shire's affidavit should be admitted under the residual exception to the rule against hearsay, *see* Fed.R.Evid. 807, but that the affidavits of other individuals contain inadmissible hearsay, to the extent that they include statements attributed to Shire.

In addition to the hearsay concerns identified by the parties, these affidavits also implicate Michigan's so-called "dead man's" statute, Mich.Comp.Laws § 600.2166, as well as the often elusive distinction between "procedural" and "substantive" law. This statute provides, in relevant part:

(1) In an action by or against a person incapable of testifying, a party's own testimony shall not be admissible as to any matter which, if true, must have been equally within the knowledge of the person incapable of testifying, unless some material portion of his testimony is supported by some other material evidence tending to corroborate his claim.

(2) A "person incapable of testifying" includes an individual who is incapable of testifying by reason of death. . . .

(3) In any such actions, all entries, memoranda, and declarations by the individual so incapable of testifying, relevant to the matter, as well as evidence of his acts and habits of dealing tending to

disprove or show the improbability of the claims of the adverse party, may be received in evidence.

(4) When the deposition, affidavit, or testimony of a person incapable of testifying is taken in his lifetime . . ., and is read in evidence in the action, the affidavit or testimony of the other party shall be admitted in his own behalf on all matters mentioned or covered in the deposition, affidavit, or testimony.

Mich.Comp.Laws § 600.2166.

■ While the parties have not agreed on much in this litigation, they apparently agree that this Michigan statute has been abrogated through the Michigan Supreme Court's 1978 adoption of Michigan Rule of Evidence 601, which provides:

Unless the court finds after questioning a person that the person does not have sufficient physical or mental capacity or sense of obligation to testify truthfully and understandably, every person is competent to be a witness except as otherwise provided in these rules.

Although the case law on this precise question is neither extensive nor particularly recent, it uniformly holds that the dead man's statute was superseded by Michigan's Rule 601. *See, e.g., Morgan v. Stanley Works*, 857 F.2d 1475, 1988 WL 96582, at *5–*6 (6th Cir. Sept.16, 1988) (unpublished); *Turbyfill v. International Harvester Co.*, 486 F.Supp. 232, 235–36 (E.D.Mich.1980); *Dahn v. Sheets*, 104 Mich.App. 584, 305 N.W.2d 547, 549 (1981).[11]

---

**10.** This citation is not only terse but extremely puzzling, given that neither of these rules is a rule of exclusion.

**11.** Although the Michigan Rules of Evidence ordinarily would not apply in federal court, Federal Rule of Evidence 601 provides that, "with respect to an element of a claim or defense as to which State law supplies the

rule of decision, the competency of a witness shall be determined in accordance with State law." Because the statements and testimony by and about the decedent here, Devon Shire, bear solely upon Essential's state-law claims, federal Rule 601 directs that Michigan law, including Michigan Rule 601, governs this Court's determinations on the competency issues surrounding this evidence. Of course,

Despite this seeming unanimity among the parties and the precedents, a recent decision by Michigan's highest court suggests, albeit only indirectly, that Michigan's dead man's statute might retain its vitality after all. In particular, in *McDougall v. Schanz*, 461 Mich. 15, 597 N.W.2d 148 (1999), the Michigan Supreme Court announced a new set of principles for determining whether the Michigan Rules of Evidence abrogate legislative enactments with evidentiary effects. *McDougall* involved a conflict between Michigan Rule of Evidence 702, which governs the admissibility of expert testimony generally, and a Michigan statute, Mich.Comp.Laws § 600.2169, which establishes particular requirements for the admission of expert testimony in medical malpractice suits. The Court held that the statute was an enactment of substantive law, and that, as such, it did not impermissibly usurp the Court's authority under the state constitution to promulgate rules governing practice and procedure in Michigan courts.

The Court's reasoning and rulings in *McDougall* have clear implications to the question now before this Court. Despite the "clear[ ] conflict" between Rule 702 and § 2169, and despite the fact that the statute "undoubtedly acts as a rule of evidence," the Court found that the statute's substantive scope brought it outside the judiciary's exclusive authority to make procedural rules concerning the "orderly dispatch of judicial business." 461 Mich. at 25–36, 597 N.W.2d at 153–59 (internal quotations and citation omitted). More generally, the Court held that a "statutory rule of evidence" must yield to the judiciary's rulemaking authority "only when no clear legislative policy reflecting considerations other than judicial dispatch of litigation can be identified." 461 Mich. at 30, 597

N.W.2d at 156 (internal quotations and citation omitted). Applying this standard to the statute at issue, the Court found that " § 2169 is an enactment of substantive law," reflecting "wide-ranging and substantial policy considerations relating to medical malpractice actions against specialists," and that, consequently, the statute did not invade the exclusive province of the judiciary by addressing "the mere dispatch of judicial business." 461 Mich. at 35, 597 N.W.2d at 158.

Much the same can be said here with respect to § 2166, the dead man's statute. This clearly is a statutory rule of evidence, governing the admissibility of testimony and other evidence derived from or concerning a "person incapable of testifying." Yet, just as clearly, the dead man's statute reflects a legislative policy judgment that witnesses should not be permitted to "l[ie] about the dead when the dead are no longer present to answer." *Hudson v. Hudson*, 363 Mich. 23, 108 N.W.2d 902, 906 (1961). This concern seemingly extends beyond the "mere dispatch of judicial business," *McDougall*, 461 Mich. at 35, 597 N.W.2d at 158, and thereby renders § 2166 an enactment of substantive law which is not abrogated by the conflicting Michigan Rule of Evidence 601.

Assuming, then, that the dead man's statute is applicable here, its express terms dictate that "all entries, memoranda, and declarations by [Defendant Devon Shire], relevant to the matter, as well as evidence of his acts and habits of dealing tending to disprove or show the improbability of the claims of the adverse party, may be received in evidence." Mich.Comp.Laws § 600.2166(3). Thus, Shire's affidavit would be admissible, as would his deposition testimony bearing on "the claims of the adverse party," Essential.

---

apart from the question of competency, this evidence also raises hearsay concerns which remain within the purview of the federal rules.

In turn, having admitted this evidence, the statute requires that "the affidavit or testimony of the other party shall be admitted in his own behalf on all matters mentioned or covered in the [decedent's] deposition, affidavit, or testimony." Mich.Comp.Laws § 600.2166(4). This provision, then, would permit the introduction of statements by, for example, Matt Krause (as an agent of Essential, *see* Mich.Comp.Laws § 600.2166(2)) concerning "all matters mentioned or covered in" Shire's deposition or affidavit. Finally, because the dead man's statute reaches only the testimony of the decedent and the "other party," and not independent third parties, *see Serkaian v. Ozar*, 49 Mich.App. 20, 211 N.W.2d 237, 240 (1973), it apparently would not exclude third party submissions—such as the affidavit of Brian Colando, submitted as an exhibit to Essential's response in opposition to Defendants' motion—recounting statements allegedly made by Shire.

To be sure, as noted earlier, the parties' evidentiary challenges are not resolvable solely by resort to Michigan's dead man's statute, but also implicate the general rule against the admission of hearsay. Yet, to the extent that Shire's own statements are offered against him, they are deemed "not hearsay" under the Federal Rules of Evidence. *See* Fed.R.Evid. 801(d)(2)(A). Moreover, the Federal Rule governing summary judgment contemplates a certain degree of reliance on hearsay, as it permits parties to submit "supporting affidavits," as well as other out-of-court statements such as "depositions, answers to interrogatories, and admissions." Fed. R.Civ.P. 56(a)–(c). Rule 56 further requires that any supporting affidavits must "set forth such facts as would be admissible in evidence," Fed.R.Civ.P. 56(e); *see also U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997), but the dead man's statute, in combination with the various exceptions to the hearsay rule, *see, e.g.,* Fed.R.Evid. 804(b)(1) (permitting the introduction of the prior deposition testimony of a declarant who is "unavailable as a witness" at trial); Fed.R.Evid. 807 (residual exception), might assist in particular instances in satisfying this requirement.

In short, the parties' evidentiary challenges implicate issues far beyond the shorthand claims of "hearsay" presented in their briefs. Rather, it is necessary, on a case-by-case basis, to first determine whether the dead man's statute requires the admission or exclusion of the evidence in question on competency grounds. Then, assuming the evidence in question is not excluded by the dead man's statute, it is necessary to consider whether a hearsay exception might bridge the gap left by Devon Shire's unavailability to testify at trial.

Fortunately, under the particular circumstances presented here, the Court need not painstakingly analyze each piece of evidence relating to Devon Shire to determine how it fits into the above rubric. First, upon reviewing the various affidavits submitted by the parties in support of their respective positions, the Court finds that little, if any, of their content contributes anything to the present inquiry. Significantly, all of the key players have been extensively deposed, including Devon Shire. To the extent that the affidavits merely confirm this deposition testimony, they are superfluous and may be disregarded. Further, "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986).

Next, as discussed at length below, it is the *absence* of necessary evidence that is largely determinative of the present motions. Specifically, most of Essential's state-law claims founder for lack of evidence as to one or more key elements, particularly as to the alleged conduct of Defendant McGraw–Hill. Plainly, the evidentiary exclusions sought by Essential, even if sustained by this Court, cannot assist in overcoming this obstacle. Accordingly, the Court largely may leave for another day such interesting questions as the continuing vitality of Michigan's dead man's statute and the possible applicability of the residual exception to the hearsay rule.

## C. Essential's State–Law Claim of Misappropriation of Trade Secrets

Essential has asserted a number of state-law claims arising from Defendant Devon Shire's resignation from Essential and his commencement of employment with McGraw–Hill. In Count V of the amended complaint, Essential alleges that Shire and McGraw–Hill unlawfully misappropriated Essential's proprietary, trade secret information in an effort to sell the "Dodge Plans" product to Essential's current and prospective customers. As one of the grounds advanced in their motion for summary judgment, Defendants argue that Essential lacks evidentiary support for each and every element of this common-law misappropriation claim. The Court cannot accept this contention in its entirety, but agrees that the evidentiary record is lacking with respect to at least one necessary element of Essential's claim: namely, that Defendants must have *used* the trade secret in question.

■ The parties agree that, under Michigan law, a common-law claim of trade secret misappropriation includes three elements: (1) the existence of a trade secret; (2) its acquisition in confidence; and (3) the defendant's unauthorized use of it. *Aerospace America, Inc. v. Abatement Technologies, Inc.,* 738 F.Supp. 1061, 1069 (E.D.Mich.1990). Defendants argue that the first of these elements is not satisfied here, because the information taken by Devon Shire when he left Essential was either publicly available or not maintained in confidence by Essential. The Court, however, cannot subscribe to this view of the evidentiary record.

■ As discussed earlier, Shire evidently took four types of information with him when he left Essential: (1) his database of customer leads; (2) the PAGEMAKE.ZIP file, consisting of various documents Shire had created using the Pagemaker software; (3) the BBSUSER.ZIP file, a compressed version of Essential's BBSUSER database kept in connection with its on-line bulletin board service; and (4) a prototype version of an Essential software program. As to the first of these, Defendants contend that Essential cannot claim Shire's database of leads as a company secret, because Shire purportedly acquired and kept this information of his own volition, and not at the behest of his employer, and because Essential never took any steps to protect the database as containing proprietary company information. In support of this argument, Defendants point to *Hayes–Albion v. Kuberski,* 421 Mich. 170, 364 N.W.2d 609, 615 (1984), in which the Michigan Supreme Court declined to extend trade secret protection to a "personal memo book" of customer names and addresses kept by the defendant, the former chief engineer of the plaintiff corporation, as part of his standard practice in performing his job. More generally, the Court noted that "there is nothing improper in an employee establishing his own business and communicating with customers for whom he had formerly done work

in his previous employment." 364 N.W.2d at 615 (footnote with citation omitted).

As Essential points out, this comparison to the "personal memo book" in *Hayes–Albion* is both factually and legally inapt. First, Defendants overlook evidence in the record suggesting that Essential did, in fact, instruct Shire to maintain a database of customer leads, and that other employees could gain access to this information only on a "need-to-know" basis. (Plaintiffs' Response, Ex. 1, Krause Aff. at ¶ 9.)[12] Matt Krause of Essential further states that the customer lead information obtained from the CAM trade group was protected by a confidentiality agreement between CAM and Essential, and that Shire was advised of this agreement and cautioned to preserve the secrecy of this information. (*Id.* at ¶¶ 8, 10.) Moreover, Essential notes that the information contained in the customer lead database extends beyond the mere "names and addresses" kept in the employee's personal memo book in *Hayes–Albion*, and included summaries of Shire's conversations with customers, various customer information such as number of employees and dollar volume, and narrative entries recounting the topics discussed during Shire's customer visits.

More generally, the Court cannot accept Defendants' apparent interpretation of *Hayes–Albion* as affording no protection to customer lists whenever an employee compiles this information in a purportedly "personal" notebook. Rather, as stated in *Hayes–Albion*, the principal inquiry is whether Essential, through its employee-agents, has obtained and used the information in question in an effort to gain "an advantage over competitors who do not know or use it." *Hayes–Albion*, 364 N.W.2d at 614 (quoting Restatement of Torts § 757, cmt. b). Customer lists are not *per se* disqualified from treatment as trade secrets under this test, as *Hayes–Albion* itself expressly recognizes. 364 N.W.2d at 614. Rather, in an earlier case discussed in *Hayes–Albion*, the Michigan Supreme Court had explained that customer information, like other information learned by an employee during the course of his job, may be subject to trade secret protection:

> While an employee is entitled to the unrestricted use of general information acquired during the course of his employment or information generally known in the trade or readily ascertainable, confidential information, including information regarding customers, constitutes property of the employer and may be protected by contract. Even in the absence of a contract, an employee has a duty not to use or disclose confidential information acquired in the course of his employment. Such information is often treated as a "trade secret."

*Follmer, Rudzewicz & Co. v. Kosco*, 420 Mich. 394, 362 N.W.2d 676, 680–81 (1984) (footnotes omitted).

Similarly, *Hayes–Albion* distinguishes between bare names and addresses of customers and information regarding "the peculiar needs of particular clients," which "increased [the defendant's] ability to compete with [the plaintiff, his former employer]." *Hayes–Albion*, 364 N.W.2d at 615; *see also Chem–Trend Inc. v. McCarthy*, 780 F.Supp. 458, 461 (E.D.Mich.1991) (noting that the defendant salesperson had

---

**12.** The Court observes that the evidence on this issue is not wholly satisfactory, as the parties have engaged in a "battle of the affidavits" on this point, with Defendants offering Shire's affidavit and Plaintiffs countering with Krause's affidavit. Tellingly, neither side has identified anything bearing upon this issue in the extensive transcripts of Shire's and Krause's depositions.

acquired "more extensive knowledge" than just the mere identities of customers, such as their particular needs and the pricing strategies employed by the plaintiff company to obtain and retain its customers). Applying these standards to the customer leads database kept by Shire during his employment with Essential, the Court finds that Essential has raised issues of fact as to whether this database contained trade secret information regarding the identities of Essential's customers and additional "peculiar needs" and other customer-specific details that Shire might have learned during his client dealings and visits on Essential's behalf.[13]

■■■ Regarding the Pagemaker files and the BBSUSER database, the Court agrees with Defendants that the evidentiary record contains little support for the proposition that these files contained trade secret information. The documents created by Shire using Pagemaker apparently consist largely of templates and forms which were regularly distributed to customers and used in product marketing, and therefore are ineligible for trade secret protection. See Rainbow Nails Enters., Inc. v. Maybelline, Inc., 93 F.Supp.2d 808, 827 (E.D.Mich.2000); Aerospace America, 738 F.Supp. at 1070; Kubik, Inc. v. Hull, 56 Mich.App. 335, 224 N.W.2d 80, 92 (1974). The BBSUSER database consists largely of customer identification information which, standing alone, might not be eligible for trade secret protection if it could be learned from other sources. However, Essential offers the testimony of Matt Krause that portions of the PAGEMAKE.ZIP and BBSUSER.ZIP files contain internal sales methodologies and customer-specific information beyond bare identification, such as the amounts paid for services and the expiration dates of their subscriptions. (See Defendants' Motion, Ex. 5, Krause Dep. at 43, 56, 66–67, 86–87.) This testimony is sufficient to raise issues of fact as to whether these files are subject to trade secret protection.[14] Finally, there would seem to be little doubt that the prototype software allegedly taken by Shire is entitled to some degree of trade secret protection, as it had not yet been released to the public. (Id. at 87–89.)

The next element of Essential's claim of misappropriation of trade secrets is acquisition in confidence by the defendant. This element requires that a confidential relationship must have existed between the parties. Aerospace America, 738 F.Supp. at 1070. Such a relationship may be established through a written non-disclosure agreement, Aerospace America, 738 F.Supp. at 1071, but Essential concedes that it obtained no such agreement from Shire. Alternatively, the requisite confidential relationship may be implied by law, under circumstances giving rise to fiduciary duties or obligations of confidentiality as between the parties. 738 F.Supp. at 1071.

Defendants argue that an employer/employee relationship, standing alone, does

---

**13.** In addition, Essential notes that Shire was unable to produce during discovery a copy of the customer lead database he took when he left the company. Instead, he testified that he threw away the laptop computer where he had stored this data. As Essential points out, this destruction of evidence would permit the drawing of an adverse inference against Defendants with regard to the protectible content of the database. See Jones, Rosen, Weg-ner & Jones, Federal Civil Trials & Evidence, § 8.404 (1999).

**14.** Moreover, Essential correctly points to Shire's extensive and clandestine efforts to secure copies of these files as giving rise to an inference that they contained information that he deemed significant and, perhaps, confidential.

not give rise to obligations of confidentiality. To be sure, the case law speaks of an additional requirement that "there be an explicit, at least verbal, warning that the information disclosed is confidential and/or not to be disclosed or used without authorization." *Aerospace America*, 738 F.Supp. at 1071. Yet, while Defendants deny that any such warning was given, Essential points to the affidavit of Matt Krause stating just the opposite. This purported warning, combined with the parties' employer/employee relationship, suffices to raise issues of fact as to the "acquired in confidence" element of Essential's misappropriation claim. *See Aerospace America*, 738 F.Supp. at 1071; *Kubik*, 224 N.W.2d at 92; *see also Chem–Trend*, 780 F.Supp. at 460 (finding that fiduciary duties existed between the plaintiff employer and the defendant salesperson while the defendant remained in the plaintiff's employ).

■ Nevertheless, the fact that Shire might well have taken trade secret information, and that he might have acquired this information in confidence, is unavailing to Essential absent evidence that Shire and McGraw–Hill actually *used* this information. *See Rainbow Nails*, 93 F.Supp.2d at 831. Essential seeks to satisfy this element of its misappropriation claim by pointing to: (1) Shire's surreptitious and destructive acts in copying and deleting information from Essential's computers; (2) Shire's disclosure to McGraw–Hill during an interview that he maintained a database of customer leads; (3) Shire's immediate participation in sales calls as soon as he arrived at McGraw–Hill; and (4) Essential's slumping sales performance and loss of clients following Shire's resignation. The Court, however, finds that this evidence, whether viewed separately or in combination, simply is not sufficient to create a genuine issue of fact as to Defendants' use of Essential's trade secrets.

First, as to Shire's deletion and copying of information from Essential's computers and his disclosure to McGraw–Hill of the existence of a customer lead database, these actions reflect, at most, Shire's judgment that this information might be of use during his employment with McGraw–Hill. If so, there is no evidence that Shire's prediction came true. To the contrary, Michael Reeves of McGraw–Hill testified that he was not interested in the customer lead database mentioned by Shire during his interview. Defendants also have offered unrefuted testimony that McGraw–Hill's existing sales force made the decisions on which customers to visit and when, while Shire merely accompanied salespeople on calls at their request. In short, while Shire plainly put himself in a position to exploit the information he brought with him from Essential, there is absolutely nothing in the record to indicate that he actually put this information to use at McGraw–Hill, nor that any of his new employer's sales efforts were altered or affected in any way in light of this information.

Moreover, Shire's participation in McGraw–Hill's customer visits and Essential's lagging sales and loss of clients do not serve as evidence of Defendants' improper use of Essential's trade secrets. Only rank speculation could forge the necessary link between these events and the trade secret information allegedly taken by Shire. For example, under the present evidentiary record, it is entirely possible that Shire was asked to accompany McGraw–Hill's salespeople on their customer visits, and that these sales calls produced some successes, not because of any proprietary information acquired and used by Shire, but because of his superior sales skills and his greater familiarity with

computer-based systems for viewing and manipulating construction drawings and blueprints, gleaned from his years of selling Essential's "electronic planroom" product. Essential cannot claim a proprietary or trade secret interest with respect to either of these latter two skills, and Shire was free to use them in his new job. The Court does not mean to suggest that this scenario is the correct one, or that Essential's suspicions of unlawful use are completely mistaken. These suspicions, however, are just that, unsupported by any record evidence, and the Court finds no basis for submitting them to the jury so that the factfinder can make the conjectural leap advocated by Essential.

Similarly, Essential offers nothing beyond speculation as to the purported connection between Shire's removal of trade secret information and his former employer's declining sales and loss of customers. Again, the Court can readily identify at least three "innocent" explanations for these events. First, Shire's skill as a salesperson could have produced this result, quite apart from any trade secret information he took from Essential.[15] Next, given McGraw–Hill's well-established and national presence in the construction news industry, and its recent introduction of a computer-based electronic plans and specifications service, it is possible that at least some customers defected from Essential to McGraw–Hill based on their longstanding and pre-existing relationships with McGraw–Hill. In fact, at least one customer, Stafford Insulation, apparently switched from Essential to McGraw–Hill for this reason, among others. (*See* Defendants' Motion, Ex. 15,

Welch Aff. at ¶¶ 16–17.) Finally, some customers might have switched to the recently-unveiled "Dodge Plans" service upon deciding that it was a better product than Essential's. (*See id.* at ¶ 15.)

In short, the Court declines Essential's invitation to let the jury decide which of these possible scenarios is the correct one. The Court may do so only if there is evidence from which the jury could infer Defendants' use of Essential's trade secrets. Because the evidentiary record is wholly lacking as to this element of Essential's misappropriation claim, the Court finds that Defendants are entitled to summary judgment in their favor on this claim.

## D. Essential's State–Law Claims of Tortious Interference

In Counts VII and VIII of its amended complaint, Essential asserts state-law claims of tortious interference with contracts and tortious interference with advantageous business relationships and prospective economic advantage. In their motion for summary judgment, Defendants argue that Essential has failed to produce evidence in support of two elements of these claims: (1) an improper act by Defendants, and (2) a causal link between this act and the termination of a business relationship between Essential and a current or prospective customer. For many of the same reasons discussed above with regard to Essential's misappropriation claim, the Court agrees that the evidentiary record is wholly lacking with respect to the second of these two elements.

---

15. Given this distinction between lawful sales activity and competition and unlawful use of trade secrets, the Court cannot subscribe to Essential's view that Michael Reeves of McGraw–Hill effectively "admitted" McGraw–Hill's misuse of Essential's trade secrets by testifying that McGraw–Hill's improvement in sales of its "Dodge Plans" product was attributable to Shire, at least in part, and coincided with McGraw–Hill's hiring of Shire.

Under Michigan law, the elements of a tortious interference claim are: (1) a contract, business relationship, or expectancy with a third party; (2) the defendant's knowledge of this contract, relationship, or expectancy; (3) an intentional and improper interference by the defendant causing a breach, disruption, or termination; and (4) damage to the plaintiff. *Liberty Heating & Cooling, Inc. v. Builders Square, Inc.*, 788 F.Supp. 1438, 1447 (E.D.Mich.1992). Leaving aside the question whether Defendants acted improperly, or whether they instead merely engaged in lawful competition,[16] Essential must show that these actions caused the disruption or termination of a relationship with an existing customer or foiled an anticipated relationship with a prospective customer.

Once again, Essential attempts to satisfy this evidentiary burden by pointing solely to McGraw–Hill's improved sales performance and Essential's loss of sales and customers just after Shire left Essential and began working for McGraw–Hill. As discussed earlier, however, these bare facts, standing alone, do not establish the requisite causal connection. Rather, Essential must produce sufficient evidence from which a jury could reasonably infer that these events were not mere coincidences or attributable to lawful competition, but instead were brought about by Defendants' improper conduct. As with Essential's misappropriation claim, the Court cannot allow the factfinder to engage in idle speculation untethered to the evidentiary record. Yet, Essential has not produced any evidence from which the jury could determine which of the possible explanations of the parties' changes in relative sales performance is the correct one. Accordingly, Defendants are entitled to summary judgment in their favor on Essential's tortious interference claims.

## E. Essential's State–Law Claim of Breach of Fiduciary Duty

In its next state-law claim, Essential asserts that Defendant Devon Shire breached his fiduciary duties to Essential by taking its proprietary trade secret information, deleting information from Essential's computers, and exploiting the allegedly stolen information to his own and McGraw–Hill's advantage. In seeking summary judgment in their favor on this claim, Defendants offer only the conclusory assertion that this claim must succeed or fail along with Essential's claim of trade secret misappropriation.

The Court fails to see why this is so. For example, even assuming the information taken by Shire when he left Essential does not rise to the level of trade secrets— a proposition the Court already has declined to accept as a matter of law—Shire did more than just take information, he also allegedly destroyed it. Defendants do

---

16. As evidence of McGraw–Hill's allegedly improper actions, Essential cites its competitor's purportedly "unethical" dealings as it negotiated a possible license to market Essential's products, its act of "enticing" Shire to leave Essential and join McGraw–Hill, and its immediate employment of Shire to help sell its competing product. All of these actions, however, appear entirely consistent with lawful competition.

As for Shire, Essential first points to his "clandestine" decision to leave Essential and join a competitor, as well as his purported statement to a third party that he intended to put Essential out of business. However, these are perfectly lawful activities, in the absence of an agreement by Shire not to compete against Essential or to solicit its customers. Essential also points to Shire's deletion of data from Essential's computers and his secret copying of this information to his computer at home. The Court agrees that these latter activities might well satisfy the "improper act" element of Essential's tortious interference claim against Shire.

not deny that Shire owed fiduciary duties to Essential while he remained in the company's employ, and the case law confirms this point. *See Chem–Trend*, 780 F.Supp. at 460. Therefore, Essential is entitled to recover for any losses they suffered as a result of Shire's actions, such as his purported deletion of company computer files, while he remained an employee of Essential.[17]

 The Court cannot agree, however, with Essential's further claim that McGraw–Hill should share in this liability. Rather, as Essential acknowledges, McGraw–Hill must have "knowingly participated" in Shire's alleged breaches of fiduciary duties in order to charge the company with liability. *Hayes–Albion*, 364 N.W.2d at 617. Essential has failed to produce any evidence of such knowing participation, and thus cannot recover from McGraw–Hill on its breach of fiduciary duty claim.[18]

## F. Essential's Federal Claim of Patent Infringement

The Court turns next to Essential's sole federal claim, that McGraw–Hill infringed its rights under the '827 Patent by "making, using, offering to sell and selling the 'Dodge Plans' software." (Amended Complaint at ¶ 23.) In its motion for summary judgment, Essential seeks a determination as a matter of law that McGraw–Hill's software infringes claim 5 of the '827 Patent, either literally or under the doctrine of equivalents. McGraw–Hill opposes Essential's motion, and also argues in its own motion for summary judgment that the asserted claims of the '827 Patent—specifically, claims 1 through 5, 7, and 9—are invalid as a matter of law, on the alternative grounds of anticipation and obviousness. Upon thorough consideration of this matter, the Court concludes that the asserted claims of the '827 Patent are invalid for obviousness. It follows that the Court need not reach the other issues raised in the parties' motions.

### 1. The Standards Governing the Obviousness Inquiry

Section 103 of the Patent Act prohibits the patenting of an "obvious" invention. This section provides, in relevant part:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a). "It is black letter law that the ultimate question of obviousness is a question of law." *Richardson–Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir.1997); *see also Relume Corp. v. Dia-*

---

17. Admittedly, Essential has not identified any evidence of losses attributable to Shire's conduct. Yet, because Defendants failed to focus on this point in their motion, Essential was not called upon to produce such evidence.

18. Under similar reasoning, Essential cannot prevail in its final state-law claim of civil conspiracy. This theory of recovery requires proof of "concerted action" to "accomplish an unlawful purpose" or a "lawful purpose by unlawful means." *Mays v. Three Rivers Rubber Corp.*, 135 Mich.App. 42, 352 N.W.2d 339, 341 (1984). Yet, as explained above, Essential has not pointed to any evidence that McGraw–Hill participated in Shire's alleged actions of deleting data from Essential's computers and copying files to his computer at home. Moreover, as held earlier, Essential has failed to produce evidence that McGraw–Hill used any information Shire might have taken from his former employer.

*light Corp.,* 63 F.Supp.2d 788, 817 (E.D.Mich.1999).

There are, however, factual issues underlying the obviousness inquiry. *See Richardson–Vicks,* 122 F.3d at 1479; *Relume Corp.,* 63 F.Supp.2d at 817–18. The relevant considerations were announced by the Supreme Court over thirty years ago:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness, these inquiries may have relevancy.

*Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). Because a patent and its claims are presumed valid, *see* 35 U.S.C. § 282, the party challenging a patent—in this case, McGraw–Hill—must establish the facts supporting a determination of invalidity by clear and convincing evidence. *See Richardson–Vicks,* 122 F.3d at 1480.

Under § 103, the central inquiry is "whether the combined teachings of the prior art, taken as a whole, would have rendered the claimed invention obvious to one of ordinary skill in the art." *In re Napier,* 55 F.3d 610, 613 (Fed.Cir.1995); *see also Indian Head Indus., Inc. v. Ted Smith Equipment Co.,* 859 F.Supp. 1095, 1099 (E.D.Mich.1994). In conducting this inquiry, however, the Court must take care not to engage in "hindsight recreation" of the subject patent from the prior art. *Al–Site Corp. v. VSI Int'l, Inc.,* 174 F.3d 1308, 1325 (Fed.Cir.1999). Rather, there must be "some motivation or suggestion to combine the prior art teachings," either in the prior art itself, or by reasonable inference from the nature of the problem or from the knowledge of those of ordinary skill in the art. *Al–Site Corp.,* 174 F.3d at 1324; *see also Motorola, Inc. v. Interdigital Technology Corp.,* 121 F.3d 1461, 1472 (Fed.Cir.1997). Moreover, the Court must perform its inquiry from the vantage point of the "time of the invention." *Indian Head Indus.,* 859 F.Supp. at 1099.

## 2. The Relevant Prior Art

Under the first element of the *Graham* test for obviousness, the Court must determine the scope and content of the prior art. The relevant prior art "consists of those references reasonably pertinent to the particular problem with which the inventor was involved," and "necessarily encompasses not only the field of the inventor's endeavor but also any analogous arts." *Relume Corp.,* 63 F.Supp.2d at 818 (internal quotations and citations omitted).

In this case, McGraw–Hill relies primarily on two references from the prior art: (1) the "Source View" software program developed and sold by Dataware Electronics;[19] and (2) Patent No. 5,526,520 (the " '520 Patent"), which Matt Krause of Essential applied for as sole inventor on September 21, 1993, over a year before he and Brent Morrow submitted their application for the '827 Patent. As explained below, the Court agrees that both of these references qualify as prior art.

---

**19.** The "Source View" program initially was known as "Scanview," but was changed when Dataware learned that this name was already in use in the industry. In addition, at some point in 1997, Dataware was acquired by another company, Momentum Systems.

### a. The '520 Patent

■ Taking the latter reference first, McGraw–Hill argues that the '520 Patent is prior art to the '827 Patent under 35 U.S.C. § 102(e), which provides that a patent may not issue for an invention which was "described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent." Although this provision purports to address only questions of priority as between two applicants claiming the same invention, the Supreme Court has long since confirmed that it also applies in determining the relevant universe of prior art as part of a § 103 obviousness inquiry. *See Hazeltine Research, Inc. v. Brenner*, 382 U.S. 252, 255–56, 86 S.Ct. 335, 337–38, 15 L.Ed.2d 304 (1965). Moreover, as McGraw–Hill points out, the courts have held that the "patent *by another*" requirement of § 102(e) is satisfied "where the inventive entity listed on a prior art patent overlaps with the inventive entity listed on a later patent, but is not identical to the latter entity." *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 98 F.Supp.2d 362, 380 (S.D.N.Y.2000), *aff'd*, 237 F.3d 1359 (Fed.Cir.2001); *see also In re Land*, 54 C.C.P.A. 806, 368 F.2d 866, 879–81 (C.C.P.A.1966). Because the '520 and '827 Patents list overlapping but not identical "inventive entities"—*i.e.*, Krause only on the former, Krause and Morrow on the latter—and because Essential has failed to produce any evidence that the invention disclosed in the '827 Patent might predate the September 21, 1993 filing date for the '520 Patent, McGraw–Hill asserts that the '520 Patent qualifies as prior art under § 102(e).

Essential's position on this point is anything but clear. Remarkably, its brief in opposition to McGraw–Hill's motion does not even mention the '520 Patent, much less deny that it is prior art to the '827 Patent. Further, at the hearing on the parties' cross-motions, Essential's counsel expressly admitted that the '520 Patent "is prior art under [§ ] 102(e)," and that "in this instance, yes, the '520 Patent qualifies, technically, under [§ ] 102(e) as prior art." (8/31/00 Hearing Tr. at 52–53.) Similarly, the report of Essential's own expert, Richard D. Grauer, states that "[a]s an earlier-filed application having different inventorship, [the '520 Patent] became available as prior art against the '827 Patent once it was granted." (Defendants' Motion, Ex. 40, Grauer Responsive Report at 6 (citing 35 U.S.C. § 102(e)).)

Yet, in papers filed after this hearing, Essential has taken the opposite position, apparently in recognition of the crucial role the '520 Patent otherwise would play in the Court's obviousness inquiry. Essential begins with the assertion, addressed at length at the August 31 hearing, that the '827 Patent was intended all along as a "continuation-in-part" of the '520 Patent, but that the paperwork needed to achieve this result was inadvertently omitted from the initial application for the '827 Patent.[20] Essential then rea-

---

20. One court has explained the significance of "continuation-in-part" status:

A continuation-in-part application . . . is an application that is filed during the pendency of the original or parent application of the same inventor, disclosing and claiming some subject matter common to the parent application, as well as some subject matter not common to and not supported by the parent. The common subject matter is entitled to [the] filing date of the parent application while the non-common subject matter, *i.e.*, new matter, is only entitled to the actual filing date of the later filed continuation-in-part application.

*Reynolds Metals Co. v. Continental Group, Inc.*, 525 F.Supp. 950, 970 (N.D.Ill.1981).

sons that, to the extent that the '827 Patent shares subject matter in common with the '520 Patent as a continuation-in-part of this earlier patent, this shared subject matter cannot possibly be "prior art" as to the '827 Patent, because it is the product of the same, single inventive inspiration reflected in the earlier '520 Patent. In other words, to the extent that the '520 and '827 Patents share common subject matter, they must share the same date of invention as to this subject matter, and one cannot be prior to the other.

However, a careful reading of the principal case cited by Essential on this point, *Applied Materials, Inc. v. Gemini Research Corp.*, 835 F.2d 279 (Fed.Cir.1987), reveals the fallacy underlying Essential's position. In that case, the Federal Circuit overturned a lower court ruling invalidating a later patent as anticipated by an earlier one. In so holding, the court found that the invention claimed in the later '313 patent was "fully disclosed" in the earlier '712 patent. 835 F.2d at 281. Accordingly, the court concluded that the invention claimed in the '313 patent "had to be invented before the filing date of the '712 patent and the latter cannot be [§ ] 102(e) prior art to the '313 patent." 835 F.2d at 281.

As recognized in a more recent decision, the lynchpin of the holding in *Applied*

*Materials* is the concept of "full disclosure." *See Purdue Pharma*, 98 F.Supp.2d at 380–83. In particular, the disclosure in the earlier patent must demonstrate that the invention claimed in the later patent had *already been invented*, thereby entitling the later patent to the benefit of the filing date of the earlier one. The Federal Circuit has explained:

It is the disclosures of the applications that count. Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed. It extends only to that which is disclosed. While the meaning of terms, phrases, or diagrams in a disclosure is to be explained or interpreted from the vantage point of one skilled in the art, all the limitations must appear in the specification. The question is not whether a claimed invention is an obvious variant of that which is disclosed in the specification. Rather, a prior application itself must describe an invention, and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought. [The plaintiff] argues that all that is necessary to satisfy the description requirement is to show that one is "in possession" of the invention. [The plaintiff]

As discussed in this Court's August 7, 2000 Opinion and Order, Essential's counsel filed a "Request for Certificate of Correction of Patent for Applicant's Mistake" with the U.S.Patent and Trademark Office on April 17, 2000— long after the commencement of this suit, and just days after Defendants filed their present motion for summary judgment. Through this filing, Essential seeks to designate the '827 Patent as a continuation-in-part of the '520 Patent, and thereby to obtain the benefit of the '520 Patent's earlier filing date pursuant to 35 U.S.C. § 120.

Plainly, and as Essential's counsel acknowledged at the August 31 hearing, (*see* 8/31/00

Hearing Tr. at 53), this Court is not at liberty to treat the '827 Patent as a continuation-in-part of the '520 Patent, because the requested certificate of correction has not yet been issued. In any event, the Federal Circuit recently held that a certificate of correction has no effect on litigation pending at the time it is issued. *See Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1293–97 (Fed.Cir. 2000). Consequently, as the parties here agree (albeit for different reasons), the '827 Patent is not a continuation-in-part of the '520 Patent for purposes of this litigation.

accurately states the test, but fails to state how it is satisfied. One shows that one is "in possession" of *the invention* by describing *the invention,* with all its claimed limitations, not that which makes it obvious. One does that by such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention. Although the exact terms need not be used *in haec verba,* the specification must contain an equivalent description of the claimed subject matter. A description which renders obvious the invention for which an earlier filing date is sought is not sufficient.

*Lockwood v. American Airlines, Inc.,* 107 F.3d 1565, 1571–72 (Fed.Cir.1997) (citations omitted).

In light of these principles, the Court rejects Essential's eleventh-hour attempt—or, perhaps more accurately, its thirteenth-hour effort, begun only *after* the briefing and argument on McGraw–Hill's motion had been completed—to evade its counsel's express admission, at the August 31 hearing, that the '520 Patent is, in fact, prior art to the '827 Patent under § 102(e). A cursory comparison of the '520 and '827 Patents belies the contention that the subject matter claimed in the latter was "fully disclosed" in the former. The '520 Patent discloses "a method and supporting system for organizing and relating a plurality of documents, including graphic drawings," and principally addresses a "hotspotting" technique for linking and moving between a "primary document" (for example, a master construction blueprint of a building) and "secondary documents" (for example, more detailed drawings depicting portions of the building). The claimed invention does not involve manipulation of the individual constituent documents, but only permits them to be organized and linked together.[21]

In contrast, and as discussed in detail below, the '827 Patent discloses a method for manipulating *individual* construction drawings on a computer, including (i) calculating and storing a scale factor for use in converting between computer-based and real-world dimensions, (ii) using this conversion information to compute the real-world dimensions of lines and areas selected by the user from the computer display, and (iii) consulting a table of material and labor costs to provide an estimated construction cost for an area identified by the user. Only claims 7 through 9 of the '827 Patent even address the notion of multiple drawings, but they do not involve any linking of or moving between these drawings. Thus, although there is a fair degree of overlap in the preferred embodiment descriptions found in the two patents, it cannot be said that the '520 Patent fully discloses the method of manipulating individual drawings which is the subject of the '827 Patent. It follows that the '520 Patent, with its different inventorship, is available as prior art to the '827 Patent under § 102(e).

### b. The "Source View" Software

■ Turning next to the "Source View" software, McGraw–Hill argues that it is prior art to the '827 Patent under 35 U.S.C. § 102(b), which prohibits the patenting of any invention that was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." As with § 102(e), this provision applies not just to the question whether a patent

21. As stated by Essential's counsel at oral argument, "a person of ordinary skill in the art, if looking at [the '520 Patent,] would view it as directed to this linking 'hotspot' feature." (8/31/00 Hearing Tr. at 62.)

should issue, but also to the determination of what constitutes the relevant universe of "prior art" in an obviousness inquiry. *See Milliken Research Corp. v. Dan River, Inc.*, 739 F.2d 587, 599 (Fed.Cir.1984).[22] Accordingly, the status of "Source View" as prior art turns upon whether the specific version identified by McGraw–Hill, version 2.19, was sold more than a year prior to December 23, 1994, the date of filing of the application for the '827 Patent. The Court finds that McGraw–Hill has produced clear and convincing evidence of this fact, and that Essential's responsive evidence fails to raise a genuine issue to the contrary.

The evidence in support of McGraw–Hill's position includes (1) the testimony of the "Source View" programmer, Scott Becker, that the version of "Source View" referred to at his deposition was version 2.19, and that this version included the distance measurement function at issue in this action, (*see* Plaintiffs' Response, Ex. T, Becker Dep. at 12–13, 18, 20); (2) the testimony of the president of Dataware, Robert Obear, that version 2.19 of "Source View" included a "tape measure function," and that this version was available to customers in mid–1993, (*see* Defendants' Motion, Ex. 36, Obear Dep. at 10–11); and (3) the affidavit of Karen Latimer, an employee of the City of Arlington, Washington, stating that Arlington purchased version 2.19 of "Source View" in May of 1993, (*see* Defendants' Motion, Ex. 38, Latimer Aff.

at ¶¶ 3, 4). These materials, on their face, plainly establish the proposition that version 2.19 was sold more than a year before the application date of the '827 Patent.

Essential's various challenges to these items of evidence fail to undermine this proposition. First, the portion of Scott Becker's deposition testimony cited by Essential regarding Becker's practice of making backup copies of software, (*see* Plaintiffs' Response, Ex. T, Becker Dep. at 11), does not in any way support Essential's assertion that Becker was testifying about "prototype" software that was not actually sold. To the contrary, Becker expressly testified that the software under discussion at his deposition was version 2.19 of "Source View" (then known as "Scan View"). (*Id.* at 7, 18.) Similarly, the affidavit of Brent Morrow, an Essential programmer, reciting various "bugs" he found in version 2.19 of "Source View," (*see* Plaintiffs' Response, Ex. S, Morrow Decl.), does not raise a genuine issue of fact as to whether this version actually was sold.[23] Finally, Essential's citation to Karen Latimer's deposition testimony regarding "hot spotting" functionality, (*see* Plaintiffs' Response, Ex. V, Latimer Dep. at 10, 12), does not undermine Latimer's statement that her employer purchased version 2.19 of "Source View" in May of 1993 because, contrary to Essential's assertion in its brief, Latimer did *not* testify—and, tellingly, was not asked by Essential's counsel to confirm—that the version purchased at

**22.** McGraw–Hill makes both sorts of arguments here, asserting not only that "Source View" is prior art, but also that version 2.19 of this software fully embodies the invention disclosed in the '827 Patent. If this latter contention were correct, and if version 2.19 was sold more than a year before the application for the '827 Patent was filed, then Essential's patent would be invalid under the "on sale" bar set forth at § 102(b). *See Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). As discussed

below, however, the Court cannot agree that version 2.19 of "Source View," standing alone, anticipates the '827 Patent.

**23.** The Court is tempted to take judicial notice of the fact that computer software often is sold to the public despite the presence of bugs. However, in the case of this particular cyber-challenged Judge, it usually is operator error rather than a glitch in the software that is at the root of the problem.

that time included an operational "hot spotting" function. The Court finds, therefore, that Essential has failed to refute the clear and convincing evidence that version 2.19 of "Source View" was available for sale in mid–1993, and thus is eligible for consideration as prior art with respect to the '827 Patent.

It also is clear to the Court, and Essential does not dispute, that the "Source View" software lies within the same field of endeavor as the '827 Patent, or at least a closely related field—namely, the viewing of rasterized images on a computer monitor, and the measurement of distances within those computer-based images expressed in the "real world" dimensions of the underlying, scanned source image. Even if the relevant field of endeavor is narrowly confined to the computer-based manipulation of construction drawings and blueprints, Mr. Becker testified that "Source View" is capable of working with "engineering and architectural drawings," and that its measurement function was specifically added for use with just such drawings. (Plaintiffs' Response, Ex. T, Becker Dep. at 9–10.) Finally, strong evidence of the relevance of "Source View" as prior art to the '827 Patent can be found in

Essential's July 2, 1998 letter to Momentum Systems, the successor to Dataware, charging that "Source View" infringes Essential's '520 and '827 Patents, and demanding that Momentum immediately cease selling its product. (*See* Defendants' Motion, Ex. 42.)[24]

### c. The Content of the Prior Art

■ Turning, then, to the content of these two prior art references, and beginning with the "Source View" software, the Court finds no material dispute among the parties as to the basic function of this software. According to its principal developer, Scott Becker, "Source View" is a software program designed for viewing images, typically in a "TIFF" format, which are obtained either by scanning a hard-copy image through a computer scanner or by converting from another computer-based image format. (*See* Plaintiffs' Response, Ex. T, Becker Dep. at 6–10.) Similarly, Dataware's president, Robert Obear, testified that "Source View" is "an enhanced image viewing system designed to provide a common platform or a common method of displaying text and drawings and images from a variety of sources

24. Significantly, Momentum's counsel responded to these charges in an October 29, 1998 letter, rejecting the notion that Essential's patents disclose the same methods and systems as those used in Momentum's software, and also advising Essential that "Momentum Systems and its predecessor Dataware have been selling their Source View product since at least 1992, well before your client's patents were filed." (Defendants' Motion, Ex. 43.) Thus, Momentum's counsel expressed his inability to see "how the claims of the Krause patents could be interpreted in a way that cover[s] the [Source View] products and still remain valid." (*Id.*) Essential's counsel waited almost nine months to respond to this letter, and then did not address this latter point, stating only that he wished to conduct a further analysis as to whether the methods used in Momentum's software and

disclosed in Essential's patents truly were different. (*See* Defendants' Motion, Ex. 44).

While this correspondence plainly does not aid Essential's current effort to distinguish the '827 Patent from the "Source View" software, the Court agrees with Essential that it does not constitute a determinative admission that "Source View" anticipates the '827 Patent and renders it invalid. It is not clear, for instance, that the version of "Source View" addressed in this 1998 correspondence is the same or similar in all relevant respects to the 1993 version relied upon by McGraw–Hill in its motion. Nevertheless, this evidence at least suggests a similarity between the invention disclosed in the '827 Patent and *some* version of "Source View," as well as Essential's apparent concern that sales of "Source View" might detract from sales of Essential's products.

to areas in a manufacturing environment." (Defendants' Motion, Ex. 36, Obear Dep. at 8.) More generally, Essential has characterized "Source View" as "a viewer program that allows users to view images on a computer screen." (Plaintiffs' Response Br. at 31.) Both Becker and Obear testified that version 2.19 of "Source View" includes a measurement function that permits the user to select two points on the computer display and determine the distance between these two points expressed in the real-world dimension of the source drawing, (*see* Becker Dep. at 10, 18; Obear Dep. at 10–11), and Essential concedes that "Source View" "does provide some measuring capabilities," (Plaintiffs' Response, Br. at 31), albeit purportedly not to the same extent as the invention disclosed in the '827 Patent.

Next, as discussed at greater length below, the other relevant prior art reference, the '520 Patent, discloses a "method for organizing and relating several documents, including graphic documents, allows the storing of documents in a plurality of files, and thereafter identifying specific ones of those files with a project, such as blueprint documents for the construction of a building." (Defendants' Motion, Ex. 39.) The three claims set forth in the '520 Patent disclose methods for organizing and linking a series of documents, such as architectural drawings, and for defining "hotspots" that permit the user to navigate among these related documents.

### 3. The Level of Ordinary Skill in the Art

In its response to Defendants' motion, Essential asserts that "McGraw–Hill has not provided this Court with anything to consider regarding the level of ordinary skill in the art." (Plaintiffs' Response Br. at 36.) To be sure, Defendants' discussion of obviousness in their motion does not neatly track and expressly address the four factors of the *Graham* inquiry. Yet, as Defendants note in their reply brief, their expert witness, David J. Wilson, opined in his report that "[a] person of ordinary skill in the art to which the ['827 Patent] pertains would typically have approximately five years of computer programming experience with modern day development tools and a technical bachelors degree." (Defendants' Motion, Ex. 45, Wilson Expert Report at 20.) Essential has not offered any evidence to refute this contention, and Mr. Wilson's opinion appears to coincide with the level of skill reflected in the prior art. Thus, the Court accepts Mr. Wilson's unrefuted statement regarding the level of ordinary skill in the art.

### 4. Differences, If Any, Between the Claimed Invention and the Prior Art

The Court now turns to the heart of the obviousness inquiry—namely, whether there are any material differences between the invention disclosed in the '827 Patent and the teachings found in the prior art, the "Source View" software and the '520 Patent, taken as a whole. For two reasons, the Court finds that the prior art renders obvious, and therefore invalidates, all of the claims (1 through 5, 7, and 9) of the '827 Patent that are at issue in this suit.

The starting point of the Court's inquiry is the patent-in-suit, the '827 Patent.[25] Es-

---

**25.** Under *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), claim construction is an issue of law for the Court to resolve. This determination often entails a so-called *"Markman* hearing," at which the Court hears evidence and argument regarding the proper interpretation of the claims and their terms.

sential broadly characterizes the patented invention as "an image-based construction estimating system." (Plaintiffs' Response Br. at 31.) Yet, as discussed earlier, the claims at issue here disclose only a limited set of image display and measurement tools that may be used in preparing construction bids, among other purposes.[26] Specifically, claim 1 of the '827 Patent discloses a "method for manipulating a construction drawing," including the steps of storing a construction drawing in a computer file along with an associated "full scale dimension," displaying an image of this drawing on a computer monitor, obtaining and storing in the computer file the information needed to translate between "image units" on the computer-based image of the construction drawing and the "full scale dimension" of the underlying drawing itself, and calculating the "full scale dimension" between two measuring points selected by the user from the computer-based image. (Defendants' Motion, Ex. 41, '827 Patent at col. 18.)

Claim 2 of the '827 Patent, in turn, displays this calculated "full scale dimen-sion" value on the computer monitor. (Id.)[27] Claim 3 discloses a method for determining a "drawing scale value," which then is used to calculate the "full scale dimension" in the last step of claim 1. (Id.) Claim 4 discloses a different method for deriving the "drawing scale value" in claim 3, involving the determination of the number of pixels per "image unit" of the computer-based image. (Id.) Claim 5 augments the method disclosed in claim 1 by allowing for the selection of an enclosed area within the computer-based image, as opposed to simply two measuring points on that image, and then determining the "full scale area dimension" of this enclosed region. (Id. at col. 19.) Finally, the last two claims at issue, claims 7 and 9, disclose a method for manipulating a collection of construction drawings in the manner disclosed in claim 1, and a method for selecting fewer than all of the drawings from claim 7 and designating them as a separate "project." (Id. at col. 19–20.)

With these claims in mind, the Court turns to the prior art, beginning with

However, "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Technologies, Inc. v. American Science and Eng'g, Inc.*, 200 F.3d 795, 803 (Fed.Cir. 1999); *see also United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed.Cir. 1997) (observing that "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims," but that "[i]t is not an obligatory exercise in redundancy"). In this case, the parties largely agree as to the correct interpretation of the claims at issue, and the Court is satisfied that, for purposes of the present motions, the claims may be construed by resort to the plain meaning and ordinary understanding of their terms. To the extent that any doubts remain, they will be resolved in favor of the non-moving party. Under these circumstances, the Court finds it unnecessary to conduct a separate *Markman* hearing before ruling on the pending motions.

26. To be sure, claims 6 and 8 of the '827 Patent do include tools for estimating construction costs. These claims, however, are not implicated in this case, presumably because McGraw–Hill's allegedly infringing "Dodge View" software apparently does not provide such tools, but only permits the user to view and perform measurements on computer-based images of construction drawings.

27. Defendants argue that claim 2 is ambiguous in its reference to a "full scale dimension," as this precise phrase appears at three different steps of claim 1, with different meanings assigned to it at different points. For purposes of the present motion, however, the Court finds that claim 2 is sufficiently clear, and that its reference to a "full scale dimension" relates back to the most recent use of this phrase, at step (f) of claim 1.

the '520 Patent. As indicated earlier, it is immediately evident that the three claims disclosed in the '520 Patent have little in common with the claims at issue in the '827 Patent. For example, the '520 Patent does not disclose any method for measuring the real-world distance between two selected points on a computer-based image of a construction drawing, nor any method for computing the real-world area of a selected region within such an image. Likewise, the '827 Patent does not include the "hotspot" function disclosed in the '520 Patent, nor does it encompass the prior patent's method of defining and linking "primary" and "secondary" drawings. Thus, a strict claim-to-claim comparison of the two patents would leave little basis for concluding that they disclose related inventions, or that the claims of one might render obvious the claims of the other.

However, upon reviewing the descriptions of the preferred embodiments of the two patents, the Court is struck by their extensive similarities. As Defendants accurately observe, "[t]he '827 Patent includes practically the entire specification and all of the figures of the prior filed '520 Patent." (Defendants' Motion, Br. in Support at 26.) Of course, when considering the obviousness of the invention claimed in the '827 Patent in light of the prior art, the Court must look first to the claims set forth in the patent-in-suit, because "the name of the game is the claim." *Relume Corp.*, 63 F.Supp.2d at 825 (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed.Cir. 1998)). The Court's inquiry is not similarly restricted, however, when it comes to the prior art, as "[o]bviousness is to be determined not only by what the prior art expressly teaches, but by what it would suggest." *Badalamenti v. Dunham's, Inc.*, 680 F.Supp. 256, 263 (E.D.Mich.), *aff'd*, 1988 WL 113751, 862 F.2d 322 (Fed. Cir.1988). Plainly, then, the description accompanying the '520 Patent may serve as a relevant source of information, and would have been available for use by one with ordinary skill in the pertinent art as this hypothetical individual sought to develop the invention claimed in the '827 Patent.

On inspection, it quickly becomes evident that this description suggests substantial portions of the claims set forth in the '827 Patent. With regard to claim 1 of the patent-in-suit, the description of the preferred embodiment of the '520 Patent expressly identifies the functions disclosed in the first two steps of this claim, including: (1) storing each underlying construction drawing or blueprint in a separate file in computer memory, and saving a "measurement scale" along with each such file (compare '520 Patent, col. 3–4 with '827 Patent, claim 1, step (a)); and (2) displaying these drawings on a computer monitor (compare '520 Patent, col. 3 with '827 Patent, claim 1, step (b)).

More generally, the description found in the '520 Patent identifies a "scaling means for storing information regarding the measurement scale" for a given drawing or "frame," and states that a "specified scale may be associated" with each such frame, such that "[e]ach frame ... will have its own scale identifiers which [are] also stored" in the same file as the frame itself. (Defendants' Motion, Ex. 39, '520 Patent at 4.) Further, the description of the '520 Patent refers to a "quantitative means" which, upon the user's selection of a region of interest by outlining its perimeter, will "calculate the size and dimensions of the outlined area dependent on the scale associated" with a given drawing. (*Id.* at col. 5.) These calculated dimensions may then be displayed on the computer monitor. (*Id.*) Finally, this description includes a "SCALE subfunction," which permits the user to define the scale associated with a given frame, as well as a "TAKE OFF"

function, which "allows a defined perimeter or area of a building drawing ... to be outlined for automatic calculation of the dimensions thereof." (*Id.* at col. 7.)

Plainly, this description of the preferred embodiment of the '520 Patent suggests much of what is claimed in the '827 Patent. As Defendants aptly observe in their motion, all that is missing is the "how" of the scaling and measurement functionality disclosed in the '827 Patent and mentioned in the description of the prior '520 Patent. Indeed, Essential's counsel all but conceded this point at oral argument, acknowledging that the '520 Patent includes a "suggestion of scaling means," and lacks only the "details on how to go about executing it." (8/31/00 Hearing Tr. at 62.) For example, both claim 1 of the '520 Patent and its accompanying description speak of establishing a "measurement scale" for each separate drawing and storing this scale along with the drawing itself in a single file, but this prior patent fails to disclose how this measurement scale is determined, apart from stating that it may be defined by resort to the "SCALE subfunction." Similarly, the description of the preferred embodiment of the '520 Patent identifies a "quantitative means" for computing the area of a selected region, without disclosing any details as to how this calculation may be performed.

The "Source View" software fills precisely this void in the knowledge needed to arrive at the invention claimed in the '827 Patent. The principal developer of "Source View," Scott Becker, testified that version 2.19 of this software includes a "measuring tool" that permits a user to define a "real world" scale for an image being viewed on a computer display, by selecting two points on the computer-based image and informing the software of the "real world" distance between these points. (*See* Becker Dep. at 10.) Once this image-to-real-world calibration is performed, the user can then measure other distances between points on this same image, and the software calculates this distance by reference to the scale factor previously defined by the user and saved in the program's temporary memory. (*Id.* at 23–24.) Dataware's president, Robert Obear, similarly testified that version 2.19 of "Source View" offers the capability to first "calibrate" a computer-based rasterized image to the real-world coordinates of an underlying drawing, and then to use this calibration scale to determine distances between points on the computer-based image expressed in real-world coordinates. (Obear Dep. at 11, 22.)

Upon reviewing version 2.19 of the "Source View" software, its source code, and its user manual, Defendants' expert, David Wilson, confirmed that this software includes the calibration and measurement functions described by Becker and Obear. The user manual describes these functions as follows:

> You may, at any time while viewing an image, utilize an extremely useful measuring tool. Press and hold [Ctrl] and then click the left Mouse Button to activate an electronic tape measure from the point where the Mouse was clicked to another point. A value will read out at the end of the line formed by the electronic tape measure....

> If the displayed value is incorrect for the image being measured, find a known distance on the image and use that distance to calibrate the tape measure. Extend the measurement line to a known distance (such as a dimension) using care to align the starting and ending points. At the correct distance, press and hold [Ctrl] and then the *left* Mouse Button. This will display a Dialog Box.... You may enter the Correct Length, Angle (Azimuth) and "Unit of

Measure" in the appropriate space in the Dialog Box so that subsequent measurements will be accurately displayed. (Defendants' Motion, Ex. 37, Attach. A, "Source View" User Manual at 4–24–25 (figure omitted).) Upon performing these functions with version 2.19 of "Source View," Mr. Wilson verified that the software's tape measure function "operates in basically the same way as described" in the user manual, except that the measured distance was displayed in a dialog box rather than at the end of the selected line. (*Id.,* Wilson Decl. at ¶ 13.) Thus, Wilson concluded that "[u]sing the tape measure command of Scanview version 2.19, I was able to set the scale for a raster image and then perform on-screen measurements on the raster image." (*Id.* at ¶ 14.) Essential has offered no evidence to challenge Wilson's findings as to these capabilities in the "Source View" program.

The Court finds that this is clear, convincing, and unrefuted evidence that the "Source View" software, when combined with the disclosures made in the '520 Patent, provides all the knowledge and information needed to develop the invention claimed in the '827 Patent. In fact, Essential's own computer graphics and software expert, Dr. Bernard Galler, conceded as much at his deposition. Dr. Galler first agreed that "Source View" does implement, in the same or a substantially similar fashion, the two-point scaling and measurement functions described in the '827 Patent, provided that the user works with a single image and does not switch to a different image. (Plaintiffs' Response, Ex.

R, Galler Dep. at 214–22.) He then testified that "Source View" differs from the invention disclosed in the '827 Patent in two respects: (1) "Source View" does not compile and store calibration data along with each image, so that a user who performed measurements on a particular image and then returned to that image at a later date would have to recalibrate the image from scratch; and (2) "Source View" does not permit the user to organize a collection of drawings or images into a "project." (*Id.* at 42–45.) The Court agrees that "Source View" differs from Essential's claimed invention in these respects.[28]

As Dr. Galler acknowledges, however, the '520 Patent supplies the information necessary to bridge these gaps between "Source View" and Essential's claimed invention. Specifically, he testified that the '520 Patent discloses the storage of an image, or "frame," together with its associated calibration data in a single file, a capability that he found lacking in "Source View." (*Id.* at 248–50.) He also agreed that the '520 Patent includes the concept of grouping images in a "project" that was missing from "Source View." (*Id.* at 250.) Thus, Dr. Galler concluded, "If you take the features from one and the features from the other and you say put them together, you would have it." (*Id.* at 251.)

Dr. Galler, however, challenges the notion that it would have been obvious to combine the teachings and suggestions found in "Source View" and the '520 Patent. (*Id.* at 251–52.) To be sure, as indicated earlier, the Court must be careful

---

**28.** Accordingly, the Court rejects Defendants' argument in their motion that the '827 Patent is invalid as anticipated by the "Source View" software. As Essential points out, the "Source View" program "does not store any scaling information in any file." (Plaintiffs' Response Br. at 31.) Because it does not, and because the '827 Patent expressly includes this element in each of its claims, "Source View" cannot be said to incorporate each and every element of the invention claimed in the '827 Patent. Hence, it does not anticipate the claims contained in the '827 Patent. *See In re Bond,* 910 F.2d 831, 832 (Fed.Cir.1990).

not to permit hindsight to cloud its determination as to obviousness. Rather, the motivation or suggestion to combine the knowledge contained in separate prior art references must be found either in the prior art itself, or by reasonable inference from the nature of the problem or from the knowledge of those of ordinary skill in the art. *See Al–Site Corp.*, 174 F.3d at 1324.

The Court finds that this combination is suggested by Essential's own '520 Patent. As discussed earlier, this patent's description of the preferred embodiment of the claimed invention includes references to (1) a "SCALE" function for establishing the real-world calibration data associated with a particular computer-based image, (2) a "scaling means," which stores the scaling information associated with each image, (3) a "quantitative means," which uses the scaling information to compute the area and dimensions of regions outlined by the user, and (4) a "TAKE OFF" function, which automatically calculates the dimensions of a defined region within a construction drawing. Thus, the motivation for combining calibration, line measurement, and area measurement functions with image viewing and manipulation tools can be found within the description of the '520 Patent, and the claims asserted in this patent expressly include the notion of saving measurement data associated with each image. All that is missing, as noted above, is the "how"—that is, the teaching that would enable a computer programmer with appropriate skills to implement the calibration and measurement functions described in the '520 Patent. Given the motivation, as expressed in the '520 Patent, to implement these functions as part of a system for manipulating and viewing construction drawings and blueprints, it is not an act of impermissible "hindsight" to look to the "Source View" software as a source of the necessary computer programming knowledge and information. Rather, the risk of improper "hindsight recreation" is greatly diminished where, as here, "the prior art references themselves provide some explicit or implicit motivation, suggestion, or incentive for combination." *Relume Corp.*, 63 F.Supp.2d at 823.

It also is important to note that neither the "Source View" software nor Essential's own '520 Patent was disclosed to the patent examiner as part of the prosecution of the '827 Patent.[29] The presumption of patent validity, and the corresponding burden upon the challenger to prove invalidity, is heightened when the relevant prior art was presented to the patent examiner during prosecution of the application. *See Al–Site Corp.*, 174 F.3d at 1323. Conversely, when this prior art was not disclosed, the challenger's burden is more easily discharged. *See Relume Corp.*, 63 F.Supp.2d at 822. Here, the presumption of validity, and Defendants' corresponding burden, is substantially weakened by virtue of Essential's failure to disclose material prior art. Under these circumstances, the Court finds that Defendants have presented clear and convincing evidence that the invention claimed in the '827 Patent does not materially differ from the prior art, taken as a whole.

Indeed, even if "Source View" were not available as prior art, the Court still would be inclined to conclude that the '827 Patent is invalid. First, Defendants' expert, David Wilson, has identified a host of other software products in existence in 1993 or

---

29. As indicated earlier, Essential evidently seeks to explain its failure to disclose the '520 Patent as a mere oversight, brought about when the application for the '827 Patent was submitted to the Patent and Trademark Office without a "missing page" that allegedly would have identified the '827 Patent as a "continuation-in-part" of the '520 Patent.

earlier—including Intergraph "I/RAS B," the GTX "GTXRaster CAD" software, TSL "RasterEdit," and Image System Technology's "CAD Overlay ESP" software, among others—that implement the "how" of the calibration and measurement functions which was lacking in the '520 Patent. (*See* Defendants' Motion, Ex. 45, Wilson Expert Report at 30–59.) These software packages, then, arguably bridge any gaps in knowledge between the '520 Patent and the '827 Patent. While Essential argues that some of these programs are distinguishable on the basis that they operate upon vector-based drawings and not rasterized images, the Court finds no evidentiary support for the proposition that the know-how needed to perform calibration and measurement operations on rasterized images is materially different from the knowledge required to implement these operations in a vector-based product. In particular, once an image is displayed on a computer monitor, the software still must convert from pixel coordinates on the computer display to the real-world coordinates associated with the underlying drawing (for example, when a user picks two points on the display, wishing to know the real-world distance between them), and this seemingly is true without regard to the whether the drawing is represented in the computer's memory in a vector-based or raster-based format.

Moreover, even if the various software programs cited by Defendants' expert did not bridge the knowledge gap between the '520 and '827 patents, the '827 Patent still might well run afoul of the longstanding patent-law principle that mathematical algorithms cannot be patented. *See Gottschalk v. Benson*, 409 U.S. 63, 71–72, 93 S.Ct. 253, 257, 34 L.Ed.2d 273 (1972). As indicated earlier, the "how" of the calibration and measurement functions is the only new teaching disclosed in the '827 Patent—or, at least, in the claims at issue in this litigation—that was not suggested by the earlier '520 Patent. Thus, these claims assert patentable subject matter only if this new teaching qualifies for patent protection.

There is reason to suspect that it might not. To be sure, the Federal Circuit has recently sought to narrowly circumscribe the "mathematical algorithm" exception to patentability. While acknowledging the still-controlling principle that "[a] mathematical formula alone, sometimes referred to as a mathematical algorithm, viewed in the abstract, is considered unpatentable subject matter," the Federal Circuit has held that this principle is "narrowly limited to mathematical algorithms in the abstract," and does not reach patents where the "claimed invention as a whole" produces a "useful, concrete, and tangible result." *AT & T Corp. v. Excel Communications, Inc.*, 172 F.3d 1352, 1356–57 (Fed. Cir.1999).

The claims at issue here might well fall within even this narrow rule. All that they teach, when viewed in light of the prior '520 Patent, is a method for calibrating a computer-based image to an underlying real-world coordinate system so that measurements can be made on the computer-based image and the results displayed in real-world dimensions. Stated differently, these claims disclose—albeit abstractly, and without stating any express formulas—a method for translating from computer-based to real-world dimensions. Plainly, this same methodology must be applied in a variety of fields (medical imaging and computer-aided design, to name but two), whenever one wishes to view a real-world object on a computer display and perform real-world measurements on the computer-based image. To award a patent on this method would raise precisely the concern cited by the Supreme Court in *Gottschalk*—namely, that "the patent

**838**

would wholly pre-empt the mathematical formula," which "in practical effect would be a patent on the algorithm itself." *Gottschalk*, 409 U.S. at 72, 93 S.Ct. at 257.

This Court, however, need not go so far here. Rather, the Court addresses the matter only to further highlight the significant extent·to which the claims asserted in the '827 Patent overlap with the methods already disclosed or suggested in the prior '520 Patent. To the extent that the second patent exceeds the scope of the first, the Court concludes that this "something extra" may readily be found in the prior art existing at the time the application for the '827 Patent was filed.

**5. Secondary Considerations**

The fourth ánd final consideration under the *Graham* test is whether any "secondary considerations"—such as commercial success, long felt but unsolved needs, the failure of others, or unexpected results, *see Relume Corp.*, 63 F.Supp.2d at 827—might tend to negate a finding of obviousness. As Essential points out, Defendants failed to address these secondary considerations in their motion. From this omission, Essential concludes that McGraw–Hill is not entitled to summary judgment on the patent infringement claim and patent invalidity counterclaim, because this element "must" be considered under a proper *Graham* analysis. The Court cannot agree, however, that Defendants' failure to address this element is fatal to their motion.

First, Essential's argument àppears to rest on the premise that it is McGraw–Hill's burden to produce evidence as to these ¨secondary considerations." This overlooks the principal purpose of the factors cited in *Graham* as "secondary considerations," which is to *undercut* a preliminary determination that an invention was obvious in light of the prior art. Thus, for example, evidence that others have tried but. failed to produce the invention at issue tends to cast doubt on the proposition that this invention was obvious. More generally, the courts have recognized that "evidence of secondary considerations may often be the most probative and cogent evidence in the record," and may "often establish that an invention appearing to have been obvious in light of the prior art was not." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed.Cir. 1983). *Stratoflex* further explains:

It is jurisprudentially inappropriate to disregard any relevant evidence on any issue in any case, patent cases included. Thus, evidence rising out of the so-called "secondary considerations" must always *when present* be considered en route to a determination of obviousness.

713 F.2d at 1538 (emphasis added). Accordingly, while Defendants clearly should have addressed the matter in their motion, they were not obliged to produce evidence to somehow prove that secondary considerations of nonobviousness are *not* present.

Rather, since Essential undeniably is aware of the possible significance of these secondary considerations, having recognized as much in its response to Defendants' motion, it would have behooved Essential to produce evidence bearing on these factors. This is particularly so where, as outlined above, the evidence relating to the other elements of the *Graham* test points decisively toward a finding of obviousness. Tellingly, Essential has presented virtually no such evidence of secondary considerations, and instead rests its attack solely upon the conclusory assertion, unsupported by citation to the record, that both Essential and McGraw–Hill have enjoyed commercial success with their electronic image-based construction blueprint viewing and estimating systems.

Even assuming this is so, the Court finds that this claim of commercial success,

standing alone, is insufficient to overcome the other factors establishing the obviousness of the claimed invention. *Cf. Richardson–Vicks Inc.*, 122 F.3d at 1483 (noting that secondary considerations, even where present, may not be of sufficient weight to override a finding of obviousness based on the other *Graham* factors); *Relume Corp.*, 63 F.Supp.2d at 827 (same). Most importantly, Essential has failed to point to evidence of the required nexus between "the merits of the claimed invention" and the commercial success of the parties' products. *Stratoflex*, 713 F.2d at 1539. Essential claims in its brief that it "developed cutting edge technology to manipulate image files of hard copy plans and blueprints scanned into computer memory," and that it was "the first to computerize the takeoff and estimating process," while McGraw–Hill was still marketing "microfiche viewed on ancient machines the size of a Volkswagen." (Plaintiffs' Response Br. at 3.) Essential's first-to-market position and the convenience of its products over pre-existing systems, then, presumably could explain any commercial success it enjoyed, quite apart from any novelties introduced in the '827 Patent. In particular, where Essential's own '520 Patent already had introduced the concept of computer-based viewing and manipulation of construction drawings and blueprints, Essential points to no evidence indicating that the additional calibration and measurement functions disclosed in the '827 Patent might have accounted for any greater success, beyond that which could have been achieved based on the '520 Patent alone.

Moreover, the record not only is bereft of evidence that others tried and failed to produce the claimed invention, but it suggests just the opposite. As noted earlier, the measurement and calibration methods claimed in the '827 Patent could be found in a variety of other software products already in existence at the time the application for the '827 Patent was filed. Neither can Essential claim any unexpected results in arriving at the claimed invention, where, as discussed earlier, the notions of calibration and measurement tools were expressly suggested in the prior '520 Patent. Consequently, the Court finds that any secondary considerations in this case are entitled to little or no weight as compared to the other factors outlined in *Graham* and its progeny.

### 6. Conclusion as to Obviousness

In sum, upon considering the evidentiary record in its entirety in light of the factors announced by the Supreme Court in *Graham*, the Court concludes that Defendants have presented clear and convincing evidence that the invention disclosed in the '827 Patent is obvious in light of the prior art. Accordingly, all of the claims asserted by Essential in this case under the '827 Patent—specifically, claims 1 through 5, 7, and 9—are invalid under 35 U.S.C. § 103, and McGraw–Hill is entitled to summary judgment in its favor on Essential's claim of patent infringement, as well as on McGraw–Hill's counterclaim of patent invalidity.

### IV. *CONCLUSION*

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' April 5, 2000 Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Plaintiffs may go forward on their state-law breach of fiduciary duty claim against Defendant Devon Shire, but Defendants otherwise are entitled to summary judgment in their favor on Plaintiffs' remaining claims, and Defendant McGraw–Hill is entitled to summary judg-

ment in its favor on its counterclaim of patent invalidity.

IT IS FURTHER ORDERED that Plaintiffs' March 1, 2000 Motion for Summary Judgment of Infringement is DENIED.[30]

---

**30.** In light of this ruling, Defendants' April 26, 2000 Motion to Strike the Declaration of James D. Poe is moot, as the declaration in question was submitted in support of Plaintiffs' motion.